IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MELVIN MENDOZA, *et al.*,
*On behalf of themselves and others*
*similarly situated,*

    *Plaintiffs*,

v.

MO'S FISHERMAN EXCHANGE,
INC. *et al.*,

    *Defendants*.

Civil Action No. ELH-15-1427

## MEMORANDUM OPINION

Plaintiffs Melvin Mendoza, Erick Rivera, and Armando Portillo have filed suit under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, against Mo's Fisherman Exchange, Inc. and Mohammed S. Manocheh, doing business as Mo's Seafood Restaurant; Mo's Fisherman's Wharf; Mo's; Mo's Seafood Factory; Mo's Crab and Pasta Factory; and Mo's Neighborhood Bar and Grill. ECF 1 ("Complaint"). Plaintiffs allege "willful failure" by defendants "to pay Plaintiffs their wages, including minimum and overtime wages."[1] They characterize the suit as both a collective action under the FLSA and "as a class action under Fed. R. Civ. P. 23(b)(3)." ECF 1, ¶ 2. Defendants filed an Answer to the Complaint. ECF 13.

Four additional plaintiffs have since joined the suit, pursuant to 29 U.S.C. § 216(b). They are Douglas Edgardo Rivera ("D. Rivera") (ECF 9); Wiliam Rivera ("W. Rivera") (ECF 10); Samuel Gutiérrez Guevara (ECF 23); and Edwin Amilcar Sosa Garcia. ECF 34 (collectively, "Opt-In Plaintiffs").

---

[1] Plaintiffs have also lodged claims under the Maryland Wage and Hour Law, Md. Code, § 3-401 *et seq.* of the Labor & Employment Article; and the Maryland Wage Payment and Collection Law, L.E. § 3-501 *et seq.* The Complaint also includes a count for "Quantum Meruit (Individual and Class Action)." ECF 1 at 15.

Now pending before the Court is plaintiffs' "Motion for Conditional Certification and to Facilitate Notice under the Fair Labor Standards Act" (ECF 25), supported by a memorandum of law ("Motion Memo," ECF 25-1) (collectively, "Motion" or "Motion to Certify"). Their exhibits include, *inter alia*, the Declaration of Melvin Mendoza (ECF 25-4, "Mendoza Declaration"); the Declaration of Erick Rivera (ECF 25-5, "E. Rivera Declaration"); the Declaration of Wiliam Rivera (ECF 25-6, "W. Rivera Declaration"); the Declaration of Douglas Edgardo Rivera (ECF 25-7, "D. Rivera Declaration"); and the Declaration of Samuel Enrique Gutiérrez Guevara (ECF 25-8, "Guevara Declaration").[2]

In the Motion, plaintiffs also ask the Court to approve a proposed "Notice of Collective Action" (ECF 25-2) and a "Consent to Join Collective Action" form (ECF 25-3, "Opt-In Form") (collectively, "Proposed Notice"), to be sent to potential opt-in plaintiffs in the event the collective action is certified. *See* ECF 25-1, at 2. Pursuant to 29 U.S.C. § 216(b), they ask the Court to "approve the issuance of notice to the following, conditionally-certified group of similarly-situated persons" (ECF 25-1 at 10–11):

> All individuals employed by Defendants at any time during the period beginning May 19, 2012, three years prior to the date of commencement of this action, to the present who were paid on an hourly basis and who were paid below the federal minimum wage and/or did not receive overtime compensation due for hours worked in excess of forty per week.

---

[2] Erick Rivera is also known as "Erick Adari Rivera Nolasco." Armando Portillo is also known as "Neftaly Armando Portillo Guevara." *See* ECF 1 at 1. To avoid confusion among the plaintiffs with the last name of "Rivera," I have used the initial of each first name, where appropriate. Plaintiffs note that "many of the Plaintiffs have limited ability to speak and read English . . . ." ECF 25-1, at 3 n.3. Accordingly, when necessary, plaintiffs' supporting declarations include a Certificate of Translation from Spanish to English. *See, e.g.*, 25-4, Mendoza Declaration, at 5.

Defendants oppose the Motion.  ECF 28, "Opposition."  Their Opposition is supported by the Declaration of Iraj Nassiri, General Manager of "Mo's Fisherman Exchange, LLC" located in Towson, Maryland.  *Id.* at 23–25, "Nassiri Declaration;" *see also infra*, note 5.

Plaintiffs have replied (ECF 33, "Reply") and submitted three additional exhibits.  These include an excerpt from "Defendant's Response to Plaintiff's First Interrogatories to Defendants," which is signed by Manocheh (ECF 33-1, "Interrogatory Excerpt"); a letter to Manocheh from the Department of Labor ("DOL") Employment Standards Administration, dated March 16, 2015, pertaining to a prior FLSA compliance review (ECF 33-2, "DOL Compliance Letter"); and a letter from DOL's Wage & Hour Division, Northeast Region, to Jessica P. Weber, counsel for plaintiffs, providing information regarding Mo's pursuant to Weber's Freedom of Information Act ("FOIA") request.  ECF 33-3, "FOIA Letter."

The Motion has been fully briefed, and no hearing is necessary to resolve it.  *See* Local Rule 105.6.  For the reasons that follow, I will grant the Motion in part and deny it in part.

## I.     Factual Allegations[3]

### A.     Organizational Structure of Restaurants

Plaintiffs assert that "Defendants operate six restaurants in the greater Baltimore area," as follows: Mo's Fisherman's Wharf, located at the Inner Harbor in Baltimore City; Mo's Crab and Pasta Factory in the Little Italy area of Baltimore City; Mo's Neighborhood Bar and Grill on Eastern Avenue in Baltimore City; Mo's in Towson, Baltimore County; Mo's in White Marsh, Baltimore County; and Mo's Seafood Factory in Glen Burnie, Baltimore County (collectively, "Mo's").  ECF 25-1, Motion Memo, at 3 n. 4 (citing http://www.mosseafood.com/node/55, the

---

[3] The factual allegations are drawn largely from the Complaint and the exhibits.

"Location" tab on the website for "Mo's Seafood").[4]   Plaintiffs assert that Manocheh is "an owner, agent, or principal" of all the Mo's entities.  ECF 1, ¶ 14.  Moreover, they allege that Manocheh "is the founding chef and is the 'Mo' after whom the Mo's restaurants are named," with "control over the daily operations of the restaurants and employee pay."  *Id.*

According to plaintiffs, Manocheh is "in the restaurants almost daily, and engages in such tasks as delivering and inspecting inventory" and he "has the power to instruct employees on how to perform their duties and exercises that power."  *Id.*; *see also* ECF 25-4, Mendoza Declaration, ¶ 11; ECF 25-5, E. Rivera Declaration, ¶ 17; ECF 25-6, W. Rivera Declaration, ¶ 19; ECF 25-7, D. Rivera Declaration, ¶ 18; ECF 25-8, Guevara Declaration, ¶ 12 (detailing Manocheh's involvement at the restaurants where plaintiffs worked).   Moreover, plaintiffs contend that the restaurants "operate as a single entity" (ECF 25-1 at 6) and all "six restaurants share a common website."  ECF 1, ¶ 11.

Defendants "admit that Mr. Manocheh is an owner, agent or principal of Mo's Fisherman Exchange, Inc. . . . ."  ECF 13, Answer, ¶ 14.  Further, defendants acknowledge that they "own and operate a seafood restaurant, Mo's Fisherman Exchange, in Towson, Maryland."  ECF 28,

---

[4]   In ECF 1, ¶ 10, plaintiffs define the corporate defendant and the six restaurants collectively as "Mo's."  In ECF 25-1 at 3 n.4, plaintiffs list the restaurants and include two restaurants named Mo's, at different locations in Baltimore County, but omit Mo's Seafood Restaurant.

Plaintiffs sued Mo's Fisherman Exchange, Inc.  ECF 1, Complaint, at 1.  The Complaint indicates that Mo's Fisherman's Exchange, Inc. is a Maryland corporation with its principal place of business in Baltimore, Maryland.  ECF 1, ¶ 10.  Although plaintiffs refer to the Mo's restaurant in Towson as "Mo's" (*see, e.g.*, ECF 25-1 at 3 n.4), the defense refers to it as "Mo's Fisherman Exchange," "Mo's Fisherman Exchange, **LLC**" (ECF 28, Nassiri Declaration, at 23), and Mo's Fisherman Exchange, **Inc.**  ECF 13, Answer, ¶ 14.  They also admit that Mendoza was employed by Mo's Fisherman Exchange, **Inc.**  ECF 13, Answer, ¶ 6.

Neither party has addressed the discrepancies in the various naming conventions, including the distinction between Mo's Fisherman Exchange, **Inc.** and Mo's Fisherman Exchange, **LLC**.

Opposition, at 2.   However, defendants dispute that the entity "does business" as the six restaurants listed in the Complaint and the Motion.  ECF 13, ¶ 10; *see* ECF 1 at 1; ECF 25-1 at 3 n.4.

Although defendants acknowledge that "[t]here are five other restaurants in the Baltimore metropolitan area that share the 'Mo's' moniker," they claim that "each of those restaurants is separately incorporated, managed and operated, and none of those restaurants has been served by Plaintiffs.[1]"   ECF 28 at 2.   Nevertheless, in their Interrogatory Excerpt (ECF 33-1 at 3), defendants concede that Manocheh owns all six restaurants.  Further, they admit that Manocheh is "frequently present in his restaurants."  ECF 13, Answer, ¶ 14.

Defendants "deny that Mr. Mendoza was employed by Mr. Manocheh [but] admit that Mr. Mendoza was employed by Mo's Fisherman Exchange, Inc. in Towson, Maryland."  ECF 13, Answer, ¶ 6.  However, defendants dispute that E. Rivera and Portillo were ever employed by defendants.  *Id.*  ¶¶ 7, 8, 10.  In addition, they contend that Manocheh "did not exercise operational control over the Plaintiffs and did not have an employee-employer relationship with Plaintiffs."  *Id.* at 7.

Defendants rely on the Declaration of Iraj Nassiri, the General Manager of Mo's Fisherman Exchange in Towson.  He avers, in relevant part (ECF 28 at 23) (emphasis added):

> Mo's Fisherman Exchange, LLC does not own, manage, operate or conduct business as any other Mo's restaurant, including Mo's Fisherman's Wharf, Mo's Crab and Pasta Factory, Mo's Seafood Factory, Mo's Neighborhood Bar and Grill or Mo's White Marsh. Each of those restaurants are *separately incorporated, managed and operated by other corporate entities*, none of which have been sued or served in this case. *I am not employed by any of those restaurants, nor do I serve as a manager at those restaurants.*

Defendants have not provided any other documentation to establish that each restaurant is a separate corporate entity, nor do defendants discuss ownership of the alleged separate entities.

*See generally* ECF 13; ECF 28.  Notably, Nassiri avers that he is not employed by any of the other restaurants, yet there is no information reflecting the basis of his knowledge as to the corporate status of the other restaurants.  ECF 28 at 23–25.  Nor has Manocheh submitted a declaration setting forth the organizational structure of the various restaurants.

Plaintiffs submitted three exhibits with the Reply, portions of which are relevant to this inquiry.  For example, the Interrogatory Excerpt states (ECF 33-1 at 3) (italics added):

> **INTERROGATORY NUMBER 24:** Explain the relationship between you and Mo's Seafood Restaurant, Mo's Fisherman's Wharf, Mo's Seafood Factory, Mo's Crab and Pasta Factory, Mo's Neighborhood Bar and Grill, and any other of the six restaurants operated, managed, or owned by you, including the nature of any contractual relationship and the dates of any contractual relationship.

> **ANSWER NUMBER 24:** *Defendants object to Interrogatory No. 24 as Mr. Mendoza and Mr. Rivera were only employed by Mo's Fisherman Exchange, Inc., which is a separate corporation and is separately operated and managed from the other restaurants referenced above, which are all owned by Mr. Manocheh.*

> **INTERROGATORY NUMBER 25:** Identify the owners and shareholders of your Maryland restaurants, including but not limited to what percentage of the restaurants is owned by each.

> **ANSWER NUMBER 25:** *Mo's Fisherman Exchange, Inc., as well as the other restaurants referenced in Interrogatory No. 25, are owned by Mr. Manocheh.*

The Interrogatory Excerpt states that the Towson restaurant is a distinct corporate entity, but not an LLC.  It also establishes that Manocheh owns all of the Mo's restaurants. *See also* ECF 13, ¶ 14. Plaintiffs assert in the Reply that, "for all of Defendants' bluster about how each of the six restaurants are separate and distinct entities, they have failed to produce any evidence that pay or timekeeping practices actually differed between the various Mo's restaurants." ECF 33 at 9.

Plaintiffs also submitted a DOL Compliance Letter (ECF 33-2) dated March 16, 2015, sent from DOL's Wage and Hour Division to Manocheh, at the mailing address for "Mo's

Seafood" in Glen Burnie, Maryland.   *Id.* at 2.   DOL addressed its authority to conduct investigations under the FLSA, and said, *id.*: "An investigation of your company located at address [sic] shown above, Inner Harbor, Little Italy, Towson, White Marsh and Eastern Avenue locations has been scheduled . . . ."

In addition, plaintiffs submitted DOL's response to a FOIA request made by plaintiffs. ECF 33-3 at 2.   The FOIA Letter includes an attachment of "six pages of agency records" showing the "Compliance Action Report and Narrative" that DOL created as a result of the FLSA compliance investigation of Mo's.   *Id.*   At the outset, the material references the Mo's Glen Burnie location and states, in relevant part, ECF 33-3 at 4 (emphasis added):

> Mohammad Manocheh is the President and sole stockholder of the Company. The subject firm is a full-Service seafood restaurant. *Manocheh has total [sic] of five Mo's Seafood locations in the Baltimore metropolitan area.* The firm has been in business for over 20 years and was incorporated on July 23, 1992 in the state of Maryland.[5]

## B.  Plaintiffs

Plaintiffs allege that they worked for defendants in two of the six Mo's restaurants, over different periods, and in varying capacities.   They aver: "Defendants hired Plaintiffs, determined Plaintiffs' compensation rates and method of pay, assigned Plaintiffs' job duties, set their work schedules, maintained time records, and paid Plaintiffs."   ECF 1, Complaint, ¶ 18.   According to plaintiffs, "Mo's maintained the same wage payment policies and practices at all of its restaurant locations."   *Id.* ¶ 12.   To illustrate, plaintiffs note that "employees at Mo's Fisherman's Wharf and Mo's Neighborhood Bar and Grill informed Mr. [E.] Rivera that they had experienced the same wage violations that Mr. Rivera has experienced."   *Id.*   They also contend that "the

_____

[5] It is unclear why the FOIA Letter refers to five locations (ECF 33-3 at 6), and why the DOL Compliance Letter refers to six Mo's restaurant locations (ECF 33-2 at 2).   Neither party has addressed this discrepancy.

managers at the Towson and White Marsh restaurants, where Plaintiffs were employed, also regularly supervised employees at other Mo's locations as assigned by Mr. Manocheh." *Id.*

Plaintiffs rely on several declarations to support their allegations, including two of their own, and three from Opt-In Plaintiffs. *See generally* ECF 25-4–ECF 25-8.

Each affiant whose declaration accompanies the Motion to Certify estimates that between 75 and 100 employees who worked at Mo's did not receive overtime wages or the regular wages they were owed. *See* ECF 25-4, Mendoza Declaration, ¶¶ 8, 9; ECF 25-5, E. Rivera Declaration, ¶ 15; ECF 25-6, W. Rivera Declaration, ¶ 15; ECF 25-7, D. Rivera Declaration, ¶ 14; ECF 25-8, Guevara Declaration, ¶ 10.   A summary of plaintiffs' contentions is set forth below.

### 1. Melvin Mendoza

On November 4, 2014, Melvin Mendoza began to work as a dishwasher at the Mo's restaurant in Towson.  *Id.* ¶ 19; ECF 25-4, Mendoza Declaration, ¶¶ 1, 3.  His "duties included washing dishes, assisting with food preparation, stocking inventory, and performing other work assigned by Defendants."   ECF 1, ¶ 19.  Mendoza was paid $7.50 per hour in this position (ECF 25-4, ¶ 3) and quit his job (*id.* ¶ 5) on December 31, 2014.  *Id.* ¶¶ 1, 6.

Mendoza claims that he was "regularly required" to "work more than 40 hours per week." ECF 1, ¶ 21.  He asserts that in his "first 4 weeks on the job, [he] worked 6 days a week, for about 8 to 9 hours each day."  ECF 25-4, ¶ 4.  Thereafter, he "began working up to 13 to 15 hours per day."  *Id.*  In his Declaration, Mendoza avers:  "Although I almost always worked more 40 hours [sic] each week, when Mo's paid me, the restaurant paid me at the same hourly rate of $7.50 per hour for all hours that I worked, rather than time-and-one-half my regular rate for hours over 40."  *Id.*  Mendoza also contends that Mo's only paid him "wages in cash" for the first four weeks of his employment. *Id.* ¶ 6.  And, after Mendoza quit his job with Mo's in

December 2014, Mo's paid him "two checks for gross wages of $862.50 each." *Id.*  Mendoza maintains that these checks did not "fully compensate" him for the time he "worked without being paid." *Id.*

According to Mendoza, "Manocheh visited the restaurant every day" and would "supervise general operations and revise the inventory and payroll." *Id.* ¶ 11.  Additionally, Manocheh "would consult and direct [the] manager . . . ." *Id.*  Manocheh put a "manager" named Eric "in charge of pay . . . ." *Id.* ¶ 12.   Eric "processed the credit card payments, made bank runs, and was responsible for paying out the workers at the restaurant." *Id.*  Mendoza recalls that "[a]t one point" Eric "had a tally of which workers were still owed parts of their wages, and how much, on his cell phone." *Id.*   There were "a few other managers at the restaurant" with whom Mendoza was less familiar. *Id.* ¶ 13.

Mendoza recounts that he complained "directly to Mr. Manocheh" about not receiving full wages.  ECF 25-4, Mendoza Declaration, ¶ 7.  According to Mendoza, Manocheh responded that he, Manocheh, "did not have enough money." *Id.*  Mendoza also "complained to one of the managers, Eric (last name unknown)" about his wages. *Id.*  Eric told Mendoza that he, Eric, "didn't have money" and then paid Mendoza "what he had available in cash." *Id.*

The Mendoza Declaration includes five pages of handwritten time sheets that Mendoza "maintained during [his] employment with Mo's. . . ." ECF 25-4, ¶ 10.  Mendoza explains that he kept track of the hours he worked by recording the hours he worked each day, or the day after, along with the wages he was owed. *Id.* ¶ 11.   The time sheets are difficult to decipher, but appear to show records for weekly hours worked that exceeded 40 hours. *See, e.g.*, ECF 25-4 at 8–9.  For example, during one week with the dates numbered 10 through 16, Mendoza appears to have logged 57 hours. *Id.* at 8 (including days of the week, in Spanish, with corresponding

periods of work as follows: "Martes," 5:00 p.m.-2:00 a.m.; "Miercoles," 5:00 p.m.-2:00 a.m.; "Jueves," 5:00 p.m.-1:30 a.m.; "Viernes," 5:00 p.m.-2:00 a.m.; "Sabado," 5:00 p.m.-2:30 a.m.; "Domingo," 5:00 p.m.-12:30 a.m.).

In addition, Mendoza contends that he "worked alongside other employees at Mo's who also worked more than 40 hours each week." ECF 25-4, ¶ 8. He "believe[s] that they were all paid their regular hourly rate for all of the hours they worked too, rather than time-and-one-half." *Id.* According to Mendoza, his co-workers "also went at least some period of time without being paid at all or paid entirely for their work . . . ." *Id.* Mendoza "believe[s] there are probably 75 to 100 workers who have worked at a Mo's restaurant at some point since May 2012 and did not receive overtime or all the regular wages they were owed." *Id.* ¶ 9.

## 2. Erick Rivera

Erick Rivera avers that he "was employed by Mo's and its owner, Mohammed Manocheh, at the Towson location, from on/about March 28, 2013 through January 4, 2015." ECF 25-5, E. Rivera Declaration, ¶ 1; *see also* ECF 1, ¶¶ 22–24. E. Rivera began working for Mo's as a dishwasher, and was paid $7.50 per hour in that position. ECF 25-5, ¶ 3. "In fall 2013, Mo's reassigned [E. Rivera] to work as a food runner." *Id.* ¶ 4. According to plaintiffs, "Defendants required food runners to be included in a tip pooling arrangement, such that food runners received a portion of the tips earned by servers." ECF 1, ¶ 25. Yet, "Defendants did not inform Mr. Rivera of the amount of the tip credit they were taking, or of his rights as a tipped worker, including the right to retain all tips except pursuant to a valid tip pooling arrangement, and the right to receive additional compensation if his tips did not bring his hourly wage to the statutory minimum wage." *Id.*; *see also* ECF 1, ¶ 32. Moreover, plaintiffs assert: "Defendants paid Mr. Rivera and other similarly-situated tipped employees wages below the federal statutory

minimum of $7.25 an hour and the Maryland statutory minimum wage of $7.25 an hour (prior to January 1, 2015) or $8.00 an hour (as of January 1, 2015), without complying with applicable 'tip credit' requirements." ECF 1, ¶¶ 32, 33.

In his Declaration, E. Rivera described his role and compensation as a food runner (ECF 25-5, ¶ 4):

> In that position, I brought food orders to waiters and cleaned part of the kitchen. I was paid $6 per hour. I received some of the tips paid to the servers, but was never told how my share was calculated or given any other information about how the tipping arrangement worked. Managers never asked how much I had made in tips in a given night or week. I never got any notice about a tip credit.

E. Rivera claims that, while he was employed both as a dishwasher and a food runner, he "routinely worked 13 to 15 hours per day, six days per week." *Id.* ¶ 5; *see also* ECF 1, ¶ 26. E. Rivera recalls "working almost constantly with this schedule" for three months. ECF 25-5, ¶ 5. He also details a period in December 2013, during which he "was the only food runner on staff and had to work seven days a week for around 14-15 hours per day." *Id.* ¶ 6. During other weeks, he "worked about 60-70 hours per week." *Id.* ¶ 5. E. Rivera maintains that he "never received time-and-one-half for the hours over 40 that [he] worked." *Id.* ¶ 7. Instead, he was "paid [the] regular rate ($7.50 or $6) for all hours worked." *Id.*

In "October 2014, Mo's did not pay [E. Rivera] anything at all, even though [he] worked . . . regular hours." ECF 25-5, ¶ 9. And, "from about November 10, 2014 until [his] last day on January 4, 2015, Mo's again did not pay [E. Rivera] for any time that [he] worked." *Id.* When E. Rivera stopped working at Mo's, he was paid "$300 in cash to make up for the skipped pay period in October . . . ." *Id.* ¶ 10. However, according to E. Rivera, "the $300 did not come close to fully compensating [him] for this missed pay period, or for all the missed pay periods in November through January." *Id.*

E. Rivera's Declaration is supported by a photograph of a single time card.  ECF 25-5 at 7.  The time card shows the hours E. Rivera worked between December 9, 2014 and December 21, 2014.  *Id.*  Although the times stamped on the time sheet are difficult to decipher, E. Rivera contends that the time card shows that he "worked about 124 hours during this two-week period, or an average of 62 hours each week."  *Id.* ¶ 14.

E. Rivera recounts that "Eric (last name unknown) and Little Mon (spelling unknown)" were his managers.  *Id.* ¶ 16.  According to E. Rivera, "Little Mon also worked in Glen Burnie" (*id.*), and both managers "received their orders from Mr. Manocheh by phone and when he was in the restaurant."  *Id.*  E. Rivera contends that he "complained directly to Mr. Manocheh about the wages he owed [E. Rivera] at least twice."  ECF 25-5, ¶ 11.  In response, Manocheh told Rivera that he, Manocheh, "could not pay [E. Rivera] because he did not have the money."  *Id.*  Also, E. Rivera "often asked the manager, Eric . . . when [he] would be paid."  *Id.* ¶ 12.  E. Rivera was told "to ask Mr. Manocheh" and "Mr. Manocheh had said that he did not have the money to pay."  *Id.*  E. Rivera continued to work for Mo's because he "felt that if [he] quit [he] would never be paid."  *Id.*

According to E. Rivera, "other employees" with whom he worked at Mo's "also worked well over 40 hours most weeks, but Mo's never paid them time-and-one-half their regular rates for hours over 40."  ECF 25-5, E. Rivera Declaration, ¶ 8. E. Rivera "spoke to workers at Mo's White Marsh, Inner Harbor, and Eastern Avenue locations who told [E. Rivera] they experienced similar wage problems."  *Id.* ¶ 13.

E. Rivera maintains that "Mr. Manocheh visited [the restaurant where E. Rivera worked] every day."  *Id.* ¶ 17.  "During each visit, [Manocheh] would always come back to check on the kitchen and give workers and managers instructions."  *Id.*  And, E. Rivera stated: "Although Mr.

Manocheh does not speak Spanish, I can speak a little English, and so Mr. Manocheh would sometimes make comments to me directly about my work. When Mr. Manocheh was at the restaurant, he acted like a manager and owner." *Id.* ¶ 17.

### 3. Armando Portillo

Armando Portillo was hired by Mo's as a "food preparation worker in their White Marsh restaurant." ECF 1, Complaint, ¶ 27. Portillo's "wage rate" was $9.00 per hour. *Id.* ¶ 28. Plaintiffs assert: "Defendants regularly required Mr. Portillo to work well in excess of 40 hours per week, and as many as 78 hours or more each week through his employment." *Id.* ¶ 29. Portillo did not submit a declaration, nor are there wage violations directly attributed to him in the Complaint. However, the Complaint alleges: "Defendants failed or refused to compensate Plaintiffs and the class they represent for those additional hours at the legally-required overtime rate, equal to 1.5 times their regular hourly rate." *Id.* ¶ 30.

### 4. Wiliam Rivera

Wiliam Rivera was employed by Mo's from March 2013 through January 1, 2015. ECF 25-6, W. Rivera Declaration, ¶ 1. He began as a dishwasher at the Towson location, working six days a week, and received $7.50 per hour in that position. *Id.* ¶¶ 3, 4. W. Rivera states, *id.*: "During 3 of those days, I worked about 16 to 16.5 hours per day. On the other 3 days, I worked about 10 to 12 hours per day." W. Rivera later transitioned to the position of a "food preparation worker." *Id.* ¶ 5. The wage for that position began at $7.50 per hour and was raised to $8.00 per hour "at some point" during his employment. *Id.* As a food preparation worker, W. Rivera "worked 14.5 to 16.5 hours each day, 5 days a week." *Id.*

W. Rivera then "worked as a food runner from the fall of 2014 until January 1, 2015." *Id.* ¶ 6. He earned $6.00 per hour in this position and "received some of tips [sic] paid to the

servers, but was never told how [his] share of the tips was calculated or given any other information about how the tipping arrangement worked or affected [his] pay." *Id.* W. Rivera "often worked 5 days a week as a food runner." *Id.* ¶ 7. He avers that he worked "16 to 16.5 hours on two of the days[,] . . . worked 10 to 12 hour days during the other three days," or 50 to 60 hours per week if the restaurant was not busy. *Id.*

According to W. Rivera, while working at Mo's he "never received time-and-one-half for the [weekly] hours over 40" that he worked. *Id.* ¶ 8. He was paid "exclusively in cash on a biweekly basis" until August 2014, at which point Mo's began to pay him "$300 by check" and his remaining wages in cash. *Id.* ¶ 10. In November 2014, W. Rivera received a check for $300, but did not receive the balance he was owed of $415. *Id.* ¶ 11.[6] Mo's continued to pay him "only part" of his wages through December 2014. *Id.* ¶ 12. When he asked Manocheh about his missing wages, Manocheh sent him to "manager Eric Nasarin (correct spelling unknown),"[7] who sent him back to Manocheh. *Id.* ¶ 13. W. Rivera notes that he "never received a definite answer." *Id.*

W. Rivera also attached to his Declaration copies of his time sheets and personal hours record. ECF 25-6 at 7–11. Although the recorded times are difficult to decipher, he avers that the time cards show he "worked well over 40 hours each week." *Id.* ¶ 16. He also contends that Manocheh was in close contact with the manager, "Nasarin," regarding restaurant operations. *Id.*

---

[6] According to W. Rivera, the additional $415 does not include overtime wages plaintiffs allege he earned. Instead, the outstanding $415 "reflects the additional amount [he] was owed at [his] normal pay rate . . . ." ECF 25-6, ¶ 11.

[7] It is unclear if "Eric Nasarin" is the same "Eric" who is referred to as a manager by other plaintiffs, and whether "Eric" is "Iraj Nassarin," who submitted a Declaration on behalf of defendants. *See, e.g.*, ECF 25-4, Mendoza Declaration, ¶ 7; ECF 25-5, E. Rivera Declaration, ¶ 12; ECF 25-6, W. Rivera Declaration, ¶ 13; ECF 28, Opposition, at 23–25.

¶ 18.   According to W. Rivera, Manocheh visited the restaurant daily, monitored employees performing their work, and gave employees directions.  *Id.* ¶ 19.

According to W. Rivera "[s]hortly before" he was fired, he asked "Nasarin" for a raise. "Nasarin" instructed him to inquire about the raise with Manocheh.  *Id.* ¶ 20.  W. Rivera alleges that he "was fired just a couple of days later."  *Id.*

### 5. Douglas Edgardo Rivera

The Declaration of Douglas Edgardo Rivera (ECF 25-7) largely echoes those of his co-plaintiffs.  D. Rivera worked as a dishwasher (*id.* ¶ 3) at Mo's Towson location from "about May 2014 through January 2, 2015."  *Id.* ¶ 1.  He alleges that, while employed at Mo's, he worked "about 15 to 16 hours per day for two days, and during the other three days . . . worked about nine hours per day."  *Id.* ¶ 4.  He "never received time-and-one-half [his] regular rate for the hours over 40" that he worked.  *Id.* ¶ 5.  D. Rivera also claims that in certain instances he was not paid at all for the time he worked at the restaurant.  *See id.* ¶¶ 8, 9, 10.  In December 2014 and January 2015, Mo's did not pay him "any wages at all."  *Id.* ¶ 10.  D. Rivera lodged unsuccessful complaints with his manager, "Eric," and was told "there were not sufficient funds to pay" him or his coworkers.  *Id.* ¶ 12.

D. Rivera "know[s] from speaking with some of [his] colleagues that they were paid only their regular hourly rate for all of the hours they worked too, even when they worked more than 40 hours in a week."  *Id.* ¶ 13.  Further, D. Rivera claims that Manocheh visited the restaurant daily, and "knew everything that went on there."  *Id.* ¶ 18.

D. Rivera attached time sheets to his Declaration pertaining to his work at Mo's.  *See* ECF 25-7 at 6–14.  The images are difficult to discern, but he states that the "time cards show that [he] worked well over 40 hours each week."  *Id.* ¶ 15.

With respect to the end of his employment at Mo's, D. Rivera stated, *id.* ¶ 11:

I continued working for so long without wages because I hoped that Mo's would finally pay me all that I was owed, and I knew that if I left I would not ever receive the money owed to me. Eventually it became clear that neither Mo's nor Mr. Manocheh had any intention of paying me though, so I quit.

### 6. Samuel Enrique Gutiérrez Guevara

Samuel Enrique Gutiérrez Guevara worked as a dishwasher at the Mo's White Marsh location from "about May 2014 through mid-December 2014." ECF 25-8, Guevara Declaration, ¶¶ 1, 3. He was paid $7.50 per hour and worked six days a week, which generally included three days with 14 to 16 hour shifts, and three days with shifts that were "about eleven hours" long. *Id.* ¶¶ 3, 4. Guevara avers that he "consistently worked at least 75 hours per week." *Id.* ¶ 4. And, he insists that he "never received time-and-one-half" for the hours beyond 40 that he worked in a given week. *Id.* ¶ 5.

Guevara claims that he "worked alongside other employees at Mo's who also worked much more than 40 hours each week." ECF 25-8, ¶ 9. He contends that he "knows from speaking with some of [his] colleagues, both at the White Marsh and Towson locations that they were paid only their regular hourly rate for all of the hours they worked too . . . ." *Id.*

According to Guevara, he did not receive full pay at the regular wage of $7.50 per hour. He explains that he quit his job when "it became clear that neither Mo's nor Mr. Manocheh had any intention of paying" him. *Id.* ¶ 8. Guevara states, *id.* ¶ 7 (bracket alterations in original):

Nearly every pay period, I would not receive the full amount of the straight-time wages promised to me; instead, I would only receive half the amount of straight time wages due or less. For example, I usually worked about 150 hours in a two week pay period, and since my promised rate was $7.50/hour, my straight-time earnings should have been equal to $1,125. However, on pay day, I would almost always receive only $200 to $500. Sometimes I received nothing. Each time my pay was short, I would repeatedly ask two of my managers, Mark [last name unknown] and Andres [last name unknown] for the remaining balance. I usually approached them along with my colleague . . . because he knew more

English than me. The managers would often say they didn't have cash and that I should come back another day and ask.  Occasionally, they would pay out an additional amount the following week, but it fell short of the total due.  I would keep asking repeatedly, but sometimes several weeks would pass before even one pay period was made up, and I still had not received the total amount due even as of the time I quit. I believe that I am owed at least $2,500 in unpaid straight-time wages alone, not including additional amounts owed in overtime. I never received any payment after I stopped working at the restaurant.

Guevara identified "Mark, Andres, and Nelson" as the managers at the White Marsh location and asserts that Nelson was his "direct supervisor." *Id.* ¶ 11.  He maintains that Manocheh visited the White Marsh restaurant daily, that Manocheh "knew everything that went on there," and that Manocheh "watched [employees] perform [their] work and gave [them] directions." *Id.* ¶ 12.

### C. Defendants

In opposing the Motion, defendants posit: "Plaintiffs are not similarly situated because: a) they each held different jobs; b) they each were paid different amounts; c) they each were paid in a different manner; d) they reported to different managers; and e) they received different types of compensation."  ECF 28, Opposition, at 8; *see also id.* (including a chart summarizing the "factual differences" between the plaintiffs' titles, locations, pay rates, pay methods, and tip allocations).

As noted, defendants rely, *inter alia*, on the Declaration of Iraj Nassiri, the General Manager of Mo's Fisherman Exchange in Towson.  ECF 28, Nassiri Declaration, at 23–25.  He asserts that plaintiffs "each had different jobs" (*id.* ¶ 5), and that "[e]ach of those jobs at Mo's Fisherman Exchange in Towson has different job responsibilities, is subject to a different manager, and is subject to a different pay scale and rate."  Nassiri continues (*id.* ¶¶ 6, 7, 8) (alterations added):

> For example, dishwashers at the restaurant report to the chef, while runners report to the restaurant manager. In addition, dishwashers are paid an hourly minimum wage, while runners are paid at a slightly lower hourly wage rate because they receive additional payments from a tip pool with the servers and bartenders. . . .

> All tipped employees, including bartenders, servers and busboys, sign tip credit sheets explaining their legal rights. It is possible that runners were inadvertently not included with the employees who are required to sign tip credit sheets, because typically, there are only one or two runners employed at Mo's Fisherman Exchange. At all times, runners earn more than the legally required minimum wage, when the tips they receive are added to their hourly wage of $6.00 per hour. . . .

> [O]ther hourly employees at Mo's Fisherman Exchange in Towson who work as servers, hostesses, bartenders, busboys and cooks have different job responsibilities than the plaintiffs and are paid differently than the plaintiffs. Some of those hourly employees, including servers, bartenders and busboys, receive tips and are required to sign a tip credit sheet. Other of those hourly employees are paid minimum wage [sic] or higher, including hostesses and cooks.

Further, Nassiri explains:  "All employees at Mo's Fisherman Exchange are supposed to be paid by check, and I only learned upon the filing of this lawsuit that one or two employees were paid, on occasion, in cash rather than by check."  *Id.* ¶ 9.  Notably, nothing in the Nassiri Declaration indicates that employees are subject to different timekeeping policies.  To the contrary, Nassiri states (*id.* ¶ 10):  "To the best of my knowledge, all busboys, servers, bartenders, hostesses and cooks have always been paid by check and are paid through our payroll service."

Additional facts are included in the Discussion.

## II. Discussion

### A.  Conditional Certification under the FLSA

Congress enacted the FLSA in 1938 "to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of

workers.'" *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) (quoting 29 U.S.C. § 202(a)) (alterations in *Barrentine*); *see Encino Motorcars, LLC v. Navarro*, No. 15-415, ___U.S.___, at *1 (2016); *Morrison v. Cnty. of Fairfax, Va.*, ___F.3d___, No. 14-2308, at *5 (4th Cir. June 21, 2016); *McFeeley v. Jackson Street Entertainment, LLC*, ___F.3d___, No. 15-1583, at *7 (4th Cir. June 8, 2016) ("Congress enacted the FLSA to protect 'the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others.'") (citations omitted). In particular, the statute "establishe[s] a minimum wage and overtime compensation for each hour worked in excess of 40 hours in each workweek . . . ." *Perez v. Mortgage Bankers Ass'n*, ___U.S.___, 135 S. Ct. 1199, 1204 (2015) (quotations omitted) (alterations in *Perez*); *see Integrity Staffing Solutions, Inc. v. Busk*, ___U.S.___, 135 S. Ct. 513, 516 (2014); *Harbourt v. PPE Casino Resorts Md., LLC*, ___F.3d___, 2016 WL 1621908, at *2 (4th Cir. Apr. 25, 2016) ("The FLSA requires that employers pay employees the minimum hourly wage 'for all hours worked.'") (quoting *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 363 (4th Cir. 2011)).

The FLSA also established the "general rule that employers must compensate each employee 'at a rate not less than one and one-half times the regular rate' for all overtime hours that an employee works." *Darveau v. Detecon, Inc.*, 515 F.3d 334, 337 (4th Cir. 2008) (quoting 29 U.S.C. § 207(a)(1)). Thus, the FLSA is now "best understood as the 'minimum wage/maximum hour law." *Trejo v. Ryman Hospitality Properties, Inc.*, 795 F.3d 442, 446 (4th Cir. 2015) (citation omitted); *see also Monahan v. Cnty. of Chesterfield, Va.*, 95 F.3d 1263, 1266–67 (4th Cir. 1996) ("The two central themes of the FLSA are its minimum wage and overtime requirements. . . .The FLSA is clearly structured to provide workers with specific

minimum protections against excessive work hours and substandard wages.") (Internal quotations omitted).

"Under the FLSA, plaintiffs may maintain a collective action against their employer for violations under the act pursuant to 29 U.S.C. § 216(b)." *Quinteros v. Sparkle Cleaning, Inc.*, 532 F. Supp. 2d 762. 771 (D. Md. 2008). Section 216(b) states, in pertinent part:

> An action . . . may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Section 216(b) "establishes an 'opt-in' scheme, whereby potential plaintiffs must affirmatively notify the court of their intentions to be a party to the suit." *Quinteros*, 532 F. Supp. 2d at 771. Pursuant to § 216(b), "[d]eterminations of the appropriateness of conditional collective action certification and court-facilitated notice are left to the court's discretion." *Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, 686 (D. Md. 2010). But, generally, when assessing whether to certify a collective action pursuant to the FLSA, district courts in this circuit adhere to a two-stage process. *See, e.g.*, *Butler v. DirectSAT USA, LLC*, 876 F. Supp. 2d 560, 566 (D. Md. 2012); *see also Flores v. Unity Disposal & Recycling, LLC*, GJH-15-196, 2015 WL 1523018, at *2–3 (D. Md. Apr. 2, 2015); *Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 300 (D. Md. 2007).

"In the first stage, commonly referred to as the notice stage, the court makes a threshold determination of whether the plaintiffs have demonstrated that potential class members are similarly situated, such that court-facilitated notice to putative class members would be appropriate." *Butler*, 876 F. Supp. 2d at 566 (internal quotations omitted). The second stage is sometimes referred to as the decertification stage. *Butler*, 876 F. Supp. 2d at 566. "In the second

stage, following the conclusion of discovery, the court engages in a more stringent inquiry to determine whether the plaintiff class is [in fact] similarly situated in accordance with the requirements of § 216, and renders a final decision regarding the propriety of proceeding as a collective action." *Syrja*, 756 F. Supp. 2d at 686 (internal quotations and citations omitted) (alterations in *Syrja*).

The Motion pertains only to the first step of conditional certification. *See generally* ECF 25. The central question "is whether [plaintiffs] are similarly situated in a way that suggests they were victims of a common policy, scheme, or plan that violated the FLSA." *Desmond v. Alliance, Inc.*, CCB-14-3499, 2015 WL 2165115, at *3 (D. Md. May 7, 2015). So long as "the plaintiffs have offered enough evidence for the court to make such a determination, and if differences between individuals (whether with the same job or different job titles) do not make clear that a collective action would be unmanageable . . . a notice-stage certification is appropriate." *Id.* (internal citations omitted); *cf. Syrja*, 756 F. Supp. 2d at 688 (denying conditional certification because "the adjudication of multiple claims . . . would require the parties, the Court, and perhaps eventually a jury, to engage in an unmanageable assortment of individualized factual inquiries").

At the first stage, to warrant conditional certification, a plaintiff need only show that the proposed members of the collective are "similarly situated" within the meaning of 29 U.S.C. § 216(b). *Camper v. Home Quality Mgmt. Inc.*, 200 F.R.D. 516, 519 (D. Md. 2000) (citations omitted). "'[S]imilarly situated' need not mean 'identical.'" *Bouthner v. Cleveland Const., Inc.*, RDB-11-0244, 2012 WL 738578, at *4 (D. Md. Mar. 5, 2012) (citation omitted). Rather, to be similarly situated, plaintiffs must demonstrate that they were all victims of a "common policy, scheme, or plan that violated the law." *Butler*, 876 F. Supp. 2d at 566 (citing *Mancia v.*

*Mayflower Textile Servs. Co.*, CCB-08-0273, 2008 WL 4735344, at *3 (D. Md. Oct. 14, 2008));
*see also Houston v. URS Corp.*, 591 F. Supp. 2d 827, 831–32 (E.D. Va. 2008).  Moreover, at the
stage of conditional certification for FLSA collective actions, plaintiffs generally must make
"only a relatively modest factual showing" as to the existence of a common policy, scheme, or
plan that violates the FLSA.  *Butler*, 876 F. Supp. 2d at 566; *see Marroquin v. Canales*, 236
F.R.D. 257, 259 (D. Md. 2006).

Indeed, "[b]ecause the court has minimal evidence [at this stage], this determination is
made using a fairly lenient standard, and typically results in conditional certification of a
representative class."  *Calderon v. Geico General Ins. Co.*, RWT-10-1958, 2011 WL 98197, at
*4 (D. Md. Jan. 12, 2011) (quoting *Yeibyo v. E–Park of DC, Inc.*, DKC-07-1919, 2008 WL
182502, at *7 (D. Md. Jan.18, 2008)) (second alteration in *Calderon*).  However, plaintiffs must
provide "more than vague allegations with meager factual support, but [they] need not enable the
court to reach a conclusive determination whether a class of similarly situated plaintiffs exists."
*Randolph v. PowerComm Const., Inc.*, 7 F. Supp. 3d 561, 576 (D. Md. 2014) (citing *Mancia*,
CCB-08-0273, 2008 WL 4735344, at *2) (alteration in *Randolph* and internal quotations and
citations omitted).  Nevertheless, "[f]actual disputes do not negate the appropriateness of court
facilitated notice."  *Camper*, 200 F.R.D. at 520 (citations omitted).

To make the requisite showing, "[p]laintiffs may rely on '[a]ffidavits or other means,'"
such as declarations and deposition testimony."  *Butler*, 876 F. Supp. 2d at 567 (quoting
*Williams v. Long*, 585 F. Supp. 2d 679, 684–85 (D. Md. 2008)) (alterations in *Butler*).  But,
"[m]ere allegations in the complaint are not sufficient; some factual showing by affidavit or
otherwise must be made."  *Camper*, 200 F.R.D. at 520.  Based on the submissions, the court
"determines whether there is sufficient evidence to reasonably determine that the proposed class

members are similarly situated enough to conditionally certify the collective action and provide potential class members with initial notice of the action and the opportunity to 'opt-in.'" *Houston*, 591 F. Supp. at 831.

Conditional certification does not preclude defendants in the second phase of conditional collective certification from contesting whether all opt-in plaintiffs are sufficiently similarly situated. *Syrja*, 756 F. Supp. 2d at 686. As Judge Messitte has explained, "[i]n the second stage, following the conclusion of discovery, 'the court engages in a more stringent inquiry to determine whether the plaintiff class is [in fact] 'similarly situated' in accordance with the requirements of § 216, and renders a final decision regarding the propriety of proceeding as a collective action.'" *Id.* (quoting *Rawls*, 244 F.R.D. at 300).

## B. The Contentions

As discussed, plaintiffs seek to certify the following collective: "All individuals employed by Defendants at any time during the period beginning May 19, 2012 . . . to the present who were paid on an hourly basis and who were paid below the federal minimum wage and/or did not receive overtime compensation due for hours worked in excess of forty per week." ECF 25-1, Motion Memo, at 10–11.

In defendants' view, plaintiffs have not met their burden to show that the proposed collective is similarly situated. ECF 28, Opposition, at 1. They argue, *inter alia*, that variations among plaintiffs, such as in pay and position, "highlight the fact that Plaintiffs were subject to several different pay plans and procedures – not one 'overarching policy' or 'a single decision or plan.'" *Id.* at 9. In particular, defendants point out that plaintiffs have only worked at two of the six Mo's restaurants, and among themselves, they have held different positions. ECF 28 at 1. Defendants also oppose the inclusion of hourly positions other than those held by plaintiffs. For

example, they maintain that the collective should not include hourly workers who worked as bartenders, servers, hostesses, busboys, and cooks.  ECF 28, at 1, 20.

In addition, defendants insist that allowing all hourly employees to join the collective would render the proposed class unmanageable.  *See id.* at 12.  They argue that limiting the potential opt-in plaintiffs to the positions held by existing plaintiffs is necessary because a class consisting of all kinds of hourly employees would present "individualized factual differences" and "will create the need for individualized assessment and analysis of each potential opt-in Plaintiff, particularly those in different job categories than Plaintiffs."  ECF 28, Opposition, at 13.

Defendants also contend that, even if the Court determines that conditional certification is appropriate, the proposed collective is too broad.  *See, e.g.*, ECF 28, Opposition, at 1, 20.  In this regard, they oppose a collective that would include workers at the four Mo's restaurants at which no plaintiffs have worked.  *See* ECF 28 at 10.  They assert: "Plaintiffs have failed to identify a single employee at any restaurant besides Mo's Fisherman Exchange in Towson and Mo's White Marsh who was allegedly subject to the same alleged unlawful wage policies and practices as Plaintiffs."  *Id.* at 10.

Although plaintiffs' declarations suggest that they have knowledge of managers being shared across defendants' restaurants (*see, e.g.*, ECF 25-5, E. Rivera Declaration, ¶ 16), as well as employees in similar situations at the Inner Harbor and Eastern Avenue restaurants (*see, e.g.*, *id.* ¶ 13), defendants maintain that plaintiffs' inability to provide details about those potential plaintiffs should preclude the collective from including workers at other Mo's establishments. ECF 28, Opposition, at 10–11; *see also id.* at 11 n.4.  Further, they take issue with plaintiffs' assertions "that they believe that there are 75-100 employees who work or have worked at all six

Mo's restaurants since May 2012 who have been subject to the same unlawful wage practices as Plaintiffs." *Id.* at 10. Thus, defendants argue that there is no basis to support plaintiffs' claim that there is a common, unlawful wage policy at all six Mo's locations. *Id.* at 10–12.

Further, defendants insist that the proposed collective spans too long a period of time. *See* ECF 28, Opposition, at 14. As noted, plaintiffs seek certification for all Mo's hourly employees who "were employed by Defendants at any time during the period beginning May 19, 2012, three years prior to the date of commencement of this action, to the present . . . ." ECF 25-1, Motion Memo, at 10–11. According to defendants, the proposed collective involves "a time frame encompassing substantial time periods when none of the Plaintiffs had even been hired to work for Defendants." ECF 28, Opposition, at 14. Claiming that there is "absolutely no factual basis to support such an expansive class" (*id.* at 11), defendants request that, if the Motion is granted, the time frame should "be based on a date three years prior to the date the Court approves any potential notice, not May 19, 2012 . . . ." *Id.* at 18.

In their Reply, plaintiffs claim that case law shows that certification is proper even if "Plaintiffs have not provided the names of other workers in the proposed class or detailed these workers' experiences with precision." ECF 33, Reply, at 2. They assert: "Defendants' attempt to heighten the evidentiary standard at this stage should be rejected." *Id.*

Plaintiffs also maintain that the varied nature of plaintiffs' roles at Mo's, and the fact that they were paid at different rates, actually supports their allegations. *Id.* at 5. In plaintiffs' view, their "factual showing demonstrates that, despite differences in title, location, or method of payment, they were all subject to the same failures to pay all wages due under the FLSA." *Id.* They posit that "these differences strengthen rather than weaken the case for conditional certification by illustrating the widespread and common nature of Defendants' violations." *Id.* at

5–6.  Plaintiffs also argue that resolution of the factual disputes raised by defendants is premature and "irrelevant to this threshold analysis."  *Id.* at 14.

### C.  The Collective

For the reasons stated below, and given the relatively modest burden imposed on plaintiffs at this preliminary stage, I am persuaded that conditional certification of a collective action is appropriate, to include hourly workers at all six Mo's restaurants.

To begin, defendants assert that conditional certification is "inappropriate at this point because of the individualized factual and legal issues that predominate" in this case.  ECF 28 at 12. In their view, plaintiffs have failed to show that they are "similarly situated" to potential opt-in plaintiffs at four of the six Mo's locations, or as to the variety of jobs held by all hourly workers at the restaurants.  However, this assertion does not comport with the showing made by plaintiffs.

Plaintiffs contend that the Mo's in Towson is one of six restaurants commonly owned and operated by Mo's Fisherman Exchange, Inc. and Manocheh, and that the restaurants have "maintained the same wage policies and practices. . . ." *See, e.g.*, ECF 1, Complaint, ¶ 12.  They attest in their declarations that they were hourly employees of two Mo's establishments, all subjected to the withholding or manipulation of wages.  *See* ECF 25-4, Mendoza Declaration; ECF 25-5, E. Rivera Declaration; ECF 25-6, W. Rivera Declaration; ECF 25-7, D. Rivera Declaration; ECF 25-8, Guevara Declaration.  And, they believe that employees of other Mo's restaurants have also been subjected to illegal wage practices. *See*, *e.g.*, ECF 25-5, ¶¶ 13, 16.

Notably, plaintiffs' allegations extend beyond the two restaurants where plaintiffs personally worked.  To illustrate, E. Rivera, who worked at the Mo's in Towson, stated that he "spoke to workers at Mo's White Marsh, Inner Harbor, and Eastern Avenue locations who told

[him] they experienced similar wage problems." ECF 25-5, E. Rivera Declaration, ¶ 13.  This assertion expands the alleged wage violations to four of the six Mo's restaurants.  And, E. Rivera implicated a fifth Mo's restaurant, based on his assertion that managerial staff in Towson also worked at the Glen Burnie restaurant.  *Id.* ¶ 16.  Moreover, Manocheh owns all six restaurants and is involved in the operations of all of the restaurants.  *See, e.g.*, ECF 13, Answer, ¶ 14; W. Rivera Declaration, ECF 25-6 ¶ 19; ECF 33-1, Interrogatory Excerpt, at 3.  And, other records suggest that the six restaurants have a common wage payment policy.  *See* ECF 33-3, FOIA Letter, at 6 (discussing the DOL's disposition following a compliance investigation that Mo's "will hold an educational seminar on labor laws with all manager and assistant managers of *all locations owned/operated by Manocheh . . . .*").

To be sure, defendants assert that the six restaurants are separate corporate entities.  But, they have not presented any documentation, or a declaration from a person with knowledge, to support the assertion.

As indicated, Nassiri asserts that the Mo's restaurants are "separately incorporated, managed and operated."  ECF 28 at 23.  But, he is a manager at just one of the Mo's restaurants.  *Id.* Defendants have not shown any basis for his knowledge of the corporate structure or management of the entire Mo's restaurant group.  And, although Manocheh would have a basis for such knowledge, he has not submitted a declaration.  Nassiri's bald assertions, without more, do little to diminish plaintiffs' claims and supporting documentation regarding the composition of the restaurant group.  *Id.* at 23–25; *see also* ECF 25-4, Mendoza Declaration, ¶ 11; ECF 25-5, E. Rivera Declaration, ¶ 17; ECF 25-6, W. Rivera Declaration, ¶ 19; ECF 25-7, D. Rivera, ¶ 18; ECF 25-8, Guevara Declaration, ¶ 12; ECF 33-1, Interrogatory Excerpt, at 3; ECF 33-3, FOIA Letter, at 2; ECF 33-2, DOL Compliance Letter, at 4.

Contrary to the defense's assertions, the predominant wage issues appear to be the same for each plaintiff.  These claims do not involve an "unmanageable assortment of individualized factual inquiries" so as to warrant denial of conditional certification at this time.  *Syrja*, 756 F. Supp. 2d at 688; *see also Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170–71 (1989) (observing that the primary objective of a collective action under the FLSA is to serve judicial interests through resolution of a single proceeding of claims rooted in common issues of law and fact).  As the Court recognized in *Randolph*, 7 F. Supp. 3d at 577, "individual circumstances are inevitably present in a collective action[.]" (Citing *Butler*, 876 F. Supp. 2d at 570 and internal quotations and alterations omitted).

Defendants point only to standard variations to distinguish possible collective members, but the distinctions do not present particular difficulty in administration of the case.  *See, e.g.*, ECF 28 at 12–14; *see also Calderon*, RWT-10-1958, 2011 WL 98197, at *2, 6–7 (disregarding defendants' argument that factual differences across plaintiffs would "require individualized scrutiny of [plaintiffs'] day-to-day responsibilities" and noting that at the conditional certification stage, the defendants' "argument that [the] collective action will be unmanageable is purely speculative"); *cf. Syrja*, 756 F. Supp. 2d at 688 (denying conditional certification when the collective involved possible "adjudication of multiple claims . . . across multiple geographic locations throughout the country, over different time periods, in offices run by different managers").

As to the issue of whether certification should include all six restaurants, *Gilbert v Freshbikes, LLC*, 32 F. Supp. 3d 594 (D. Md. 2011), is informative.  There, Judge Chasanow discussed when, under the FLSA, "two separate entities constitute a single enterprise for purposes of liability."  *Id.* at 603.  In *Gilbert*, the plaintiff alleged FLSA and Title VII violations

by her former employer, a bicycle retail business.  In bringing her claims, the plaintiff sued four separate LLCs: one was "Freshbikes Franchising, LLC," and the other three, with various "Freshbikes" titles, had the same owner, who operated retail stores.  *Id.* at 598.  The plaintiff alleged that she had worked for two of the three retail stores.  *Id.*

All of the *Gilbert* defendants moved to dismiss the complaint.  *Id.* at 603.  They argued, *inter alia*, that they "were not Plaintiff's 'employers' as defined by the [FLSA] at the time of the events giving rise to the FLSA claim."  *Id.* at 603.  In particular, two of the entities argued that they had never employed plaintiff.  *Id.*  Plaintiff countered that her FLSA claim was "applicable to all Defendants because all four" were "effectively the 'same enterprise' under the FLSA."  *Id.*

Judge Chasanow found that the plaintiff had advanced enough in her factual allegations to suggest that the four entities qualified as a "single enterprise" under the FLSA.  *Id.* at 604. The court explained, *id.* at 603–604:

> The term "employer" under the FLSA is generally "interpreted broadly to achieve Congress's intent to provide a remedy to employees for their employers' wage and hour violations." *Pearson v. Prof'l 50 States Prot., LLC*, No. RDB-09-3232, 2010 WL 4225533, at *3 (D. Md. Oct. 26, 2010); *see also Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006) (articulating that the FLSA should be interpreted broadly).  The scope of the FLSA, however, is not limitless.  *See Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999). For two separate entities to constitute a "single enterprise" under the FLSA, they must conduct: "(1) related activities, (2) performed under unified operations or common control, and (3) for a common business purpose." *Brock v. Hamad*, 867 F.2d 804, 806 (4th Cir. 1989); *see also Martin v. Deiriggi*, 985 F.2d 129, 133 (4th Cir. 1992) (applying the three elements to determine a "single enterprise" for FLSA purposes).
>
> Related activity in claims involving retail businesses can be shown if the retailing is done for a "common purpose," even when it "involv[es] different goods at different locations." *Martin*, 985 F.2d at 133 (*citing* 29 C.F.R. § 779.207). Related activity can also be shown if the businesses perform similar functions, such as serving similar products to similar clientele. *See Gionfriddo v. Jason Zink, LLC*, 769 F. Supp. 2d 880, 892 (D. Md. 2011); *see also Donovan v. Grim Hotel Co.*, 747 F.2d 966, 970 (5th Cir. 1984) (finding that five hotels located in different cities and operated by separate corporate defendants satisfied

the "related activities" element because they "operated in the same or a similar manner, . . . [and] loosely operated under the [same] name"). The second requirement—common control—exists "where total ownership is vested in a single person." *Brock*, 867 F.2d at 807.

The third requirement—a common business purpose—can be shown through activities that are directed at the "same business objective" or at "similar objectives in which the group has an interest." *Brock*, 867 F.2d at 807. This common purpose must be more than just the common goal to make a profit, *see Martin,* 985 F.2d at 134 ("A joint profit motive is insufficient to support a finding of common business purpose."), but factors such as unified operation, related activity, interdependency, and a centralization of ownership or control can all indicate a common business purpose. *See Donovan*, 747 F.2d at 971; *see also Martin*, 985 F.2d at 133 ("[T]here is a close relationship between the 'related activities' and 'common business purpose' criteria for FLSA enterprise coverage.").

Plaintiff has alleged sufficient facts to suggest that the four Freshbikes' entities satisfy the elements of the "single enterprise" test under the FLSA at this preliminary stage of the proceedings. First, the facts alleged support the "related activities" element, as all three retailers sell bicycles and related gear, cater to similar clientele, and operate loosely under the "Freshbikes" name. (ECF No. 1 ¶¶ 8, 9). Second, Plaintiff has alleged sufficient facts to show that the four entities share common control under [the] owner . . . . (*Id.* at ¶ 8). Third, the facts may also support a "common business purpose" because of the alleged centralization of ownership and related activity.  Plaintiff's allegations are sufficient at this stage to survive Defendants' motion to dismiss on this issue.

As noted, Judge Chasanow's analysis was provided in the context of a motion to dismiss. Although the parties here have not discussed the "single enterprise" concept as to the Mo's restaurants, the discussion in *Gilbert* is useful.  In particular, the "single enterprise" doctrine undermines defendants' reliance on the claim that the six Mo's restaurants might be separate legal entities; this contention does not address the significance of Manocheh's admission of ownership of all of the restaurants (*see, e.g.*, ECF 33-1 at 3), his involvement in the operations of all the restaurants (*see, e.g.*, ECF 25-6, W. Rivera Declaration, ¶ 19; ECF 25-7, D. Rivera Declaration, ¶ 18), or the allegation that a common wage policy was in place at the restaurants.

Plaintiffs' allegations suggest that the three-part "single enterprise" standard would be satisfied in this case.  The entities are all in the food service industry (ECF 1, ¶ 11); the restaurants all utilize the "Mo's" name (*id.* ¶10; ECF 28, Opposition, at 2); all are commonly owned; Manocheh is involved in the operation of all of them; and all are located in Baltimore and its environs.  *See, e.g.*, ECF 33-1, Interrogatory Excerpt; ECF 33-3, FOIA Letter; ECF 33-2, DOL Compliance Letter.  Plaintiffs' allegations also suggest that the restaurants share a "common business purpose," in that they all operate as seafood restaurants.  *See, e.g.*, ECF 1, ¶ 11; ECF 25-1 at 3.

Accordingly, for the purpose of conditional certification, I am persuaded that plaintiffs' allegations are sufficient as to the claim that the Mo's restaurant group includes the six restaurants listed in this lawsuit.

Defendants also fail to provide any support for the contention that hourly employees in other work categories—such as bartenders, cooks, and hosts or hostesses—are not similarly situated.  *See* ECF 28 at 1–2, 8–14.  Although defendants claim that "different payment policies and practices applied" to different workers (ECF 28 at 12), the only basis for that statement seems to be that employees were paid at different rates, based on their positions and whether or not they received tips.  *See, e.g.*, ECF 28 at 12–14.  For example, defendants rely largely on imprecise assertions that the various employees, including plaintiffs, were "paid different amounts and forms of compensation" (ECF 28 at 1), or that the employees were "paid in a different manner . . . ."  *Id.* at 8.  However, standard variations in wage payments do not necessarily mean that plaintiffs are not similarly situated.  *Butler*, 876 F. Supp. 2d at 566.

Moreover, "Plaintiffs do not have to show that the potential class members have identical positions for conditional certification; plaintiffs can be similarly situated even though there are

distinctions in their job titles, functions, or pay." *Desmond*, CCB-14-3499, 2015 WL 2165115, at *3 (quoting *Robinson v. Empire Equity Grp., Inc.*, WDQ-09-1603, 2009 WL 4018560, at *3 (D. Md. Nov. 18, 2009)) (internal quotation marks omitted); *see Cedillos-Guevara v. Mayflower Textile Servs., Co.*, GLR-14-0196, 2014 WL 7146968, at *1, 3 (D. Md. Dec. 12, 2014) (conditionally certifying a collective under the FLSA involving plaintiffs who were "paid various hourly rates"); *De Luna-Guerrero v. N.C. Grower's Ass'n, Inc.*, 338 F. Supp. 2d 649, 654 (E.D.N.C. 2004) (stating that "situations [of the plaintiffs] need not be identical") (quotations omitted).

Additionally, case law suggests that opt-in plaintiffs need not necessarily occupy the same position as the initial plaintiff. *See, e.g.*, *Flores*, GJH-15-196, 2015 WL 1523018, at *4 (granting conditional certification when "Plaintiffs' declarations suggest that [the] flat-rate payment policy [that violated the FLSA] was not just limited to Plaintiff [ ], but was, instead, a company-wide practice that affected all helpers and drivers employed by [defendant] as sanitation workers.") (Alterations added). A plaintiff must only present "a similar legal issue as to coverage, exemption, or nonpayment o[f] minimum wages or overtime arising from at least a manageably similar factual setting with respect to their job requirements and pay provisions . . . ." *De Luna-Guerrero*, 338 F. Supp. 2d at 654 (quotations omitted).

In this case, the alleged common policy as to overtime wages is at the heart of the allegations, notwithstanding the positions and base pay of any particular category of worker. *See* ECF 1, Complaint, ¶¶ 1, 30, 31; ECF 25-4, Mendoza Declaration, ¶¶ 3, 4, 6; ECF 25-5, E. Rivera Declaration, ¶¶ 3, 8; ECF 25-6, W. Rivera Declaration, ¶¶ 4, 8, 11; ECF 25-7, D. Rivera Declaration, ¶¶ 4, 5; ECF 25-8, Guevara Declaration, ¶¶ 4, 5. Nassiri avers in his Declaration that "*all employees* at Mo's Fisherman Exchange [in Towson] are supposed to be paid by

check . . . ." *Id.* at 24 (emphasis and alteration added).   Further, Nassiri states that "all busboys, servers, bartenders, hostesses and cooks have always been paid by check and through *our payroll service*."   *Id.* at 25 (emphasis added).   Although defendants neither elaborate on the "payroll service" that Nassiri referenced, nor explain why food preparation workers, food runners, and dishwashers such as plaintiffs, might be excluded from that service, the allusion to a single "payroll service" suggests the restaurants may use a consistent payment method that impacts all hourly employees, which in turn suggests that defendants' wage payment practices may be standardized.   At this stage, it is reasonable to conclude that the Mo's hourly restaurant workers were subject to a common timekeeping practice or policy during the period in question.   *See, e.g.*, ECF 33-3, FOIA Letter, at 8 (showing Mo's "Compliance Status" as "Agree to Comply").

In *Banks v. Wet Dog Inc.*, RDB-13-2294, 2015 WL 433631, at *3 (D. Md. Feb. 2, 2015), Judge Bennett observed: "This Court recognizes that differences among the plaintiffs do exist: namely—rates of pay, duration of tenure, and the location at which the Plaintiffs worked. However, these minor inconsistencies do not amount to a conclusion that Plaintiffs are necessarily dissimilar."   The same logic applies here.   In any event, plaintiffs correctly observe that the issue of narrowing the collective, either to limit the restaurants included or to include only dishwashers, runners, and food preparation workers, is more appropriately left to the second stage of the certification process.   ECF 33, Reply, at 15–16.

I am satisfied that plaintiffs have made a showing sufficient to satisfy the minimal evidentiary burden that they are similarly situated to the proposed collective, as victims of a common wage practice or policy that violated the FLSA.   Therefore, conditional certification is appropriate, pursuant to 29 U.S.C. § 216(b), as to all hourly employees of the six Mo's locations. This conclusion is consistent with numerous cases that have conditionally certified collective

actions based on analogous circumstances.  *See, e.g.*, *Desmond*, CCB-14-3499, 2015 WL 2165115; *Cedillos-Guevara*, GLR-14-0196, 2014 WL 7146968, at *1, 3; *Essame v. SSC Laurel Operating Co. LLC*, 847 F. Supp. 2d 821, 825–28 (D. Md. 2012) (disregarding defendant's argument that plaintiffs' "allegations and factual circumstances are dissimilar and anecdotal" because "this argument . . . delves too deeply into the merits of the dispute; such a steep plunge is inappropriate for such an early stage of a FLSA collective action").

As to the appropriate time period, defendants assert that it is appropriate for the collective to extend three years prior to the date of this Memorandum Opinion and its corresponding Order, to the present, as opposed to three years prior to the commencement of this suit.  *See* ECF 28, Opposition, at 18.  Plaintiffs have consented to this time period.  *See*  ECF 33, Reply, at 17.

### D.  The Notice

Along with the Motion, plaintiffs filed a Proposed Notice to be sent to potential opt-in plaintiffs.  ECF 25-2, Notice of Collective Action; ECF 25-3, Opt-In Form.  Plaintiffs seek Court approval of the Proposed Notice and authorization to disseminate it to prospective plaintiffs through various means.  ECF 25-1 at 17–18, 21.

Plaintiffs also "request an Order requiring Defendants to promptly: (1) provide Plaintiffs a computer-readable database of names, last known addresses, phone number(s), e-mail addresses, and the dates of employment for all current and former hourly employees who have worked at one or more of their restaurants since May 19, 2012; and (2) post the Notice in English and Spanish at all work sites in an area that is easily viewed by employees."  ECF 25-1 at 19.

Plaintiffs assert, *id.* at 18: "Modeled on notices previously approved by this Court, the proposed Notice states the names of the parties and the nature of the Plaintiffs' claims, clarifies that the question of liability has not been decided and that the results of the suit are not

guaranteed, explains how to opt in to the action, and provides assurance that it is unlawful for employers to retaliate against those who participate." Defendants take issue with numerous aspects of plaintiffs' Proposed Notice and request modifications. ECF 28, Opposition, at 15–20.

"Neither [the FLSA], nor other courts, have specifically outlined what form court-authorized notice should take nor what provisions the notice should contain." *Moore v. Eagle Sanitation, Inc.*, 276 F.R.D. 54, 60 (E.D.N.Y. 2011) (quotations omitted and alteration added); *see also Velasquez v. Digital Page, Inc.*, 11-3892 (LDSW) (AKT), 2014 WL 2048425, at *9 (E.D.N.Y. May 19, 2014). Indeed, the Supreme Court has declined to review the contents of a proposed notice pursuant to § 216(b), observing: "[W]e decline to examine the terms of the notice . . . . We confirm the existence of the trial court's discretion, not the details of its exercise." *Hoffman-La Roche Inc.*, 493 U.S. at 170.

"The overarching policies of the FLSA's collective suit provisions [29 U.S.C. § 216(b)] require that the proposed notice provide accurate and timely notice concerning the pendency of the collective action, so that [potential plaintiffs] can make informed decisions about whether to participate." *Butler*, 876 F. Supp. 2d at 574–75 (alterations in *Butler*) (citations and quotations omitted). Notably, in implementing § 216(b), "district courts have discretion . . . ." *Hoffmann-La Roche Inc.*, 493 U.S. at 170. And, this discretion is particularly "broad" with respect to the "'details' of the notice sent to potential opt-in plaintiffs." *Butler*, 876 F. Supp. 2d at 574.

Defendants argue that the Proposed Notice is "deficient" because is "fails to notify potential class members of their right to select counsel of their own choosing, or disclose Defendants' position in any detail" and does not "provide contact information for counsel for Defendants." ECF 28 at 15. Plaintiffs have agreed to "revise the notice to add contact information for Defendants' counsel and an acknowledgement that Defendants' [sic] deny the

- 35 -

allegations in the suit . . . ." ECF 33 at 16.  However, in their Reply, plaintiffs ask to include the following language as well: "[D]efense counsel is obligated to represent the best interests of Defendants and have no legal obligation to you or your interests."   *Id.* at 16 (alteration added).

Judge Chasanow explained in *Arevalo v. D.J.'s Underground, Inc.*, DKC 09-3199, 2010 WL 2639888, at *3 (D. Md. June 29, 2010): "Courts around the country are split, with some supporting exclusion of defense counsel information . . . and some including defense counsel information . . . . Cases in this district have heretofore identified defense counsel, but not with full contact information and, occasionally, including cautionary language to putative plaintiffs." Likewise, in *Cedillos-Guevara*, GLR-14-196, 2014 WL 7146968, at *4, the court ordered the inclusion of defense counsel's contact information, stating: "Plaintiffs must add contact information for Defendants' counsel to the amended notice, but limit it to counsel's name and address."

The approach in *Cedillos-Guevara* and *Arevalo* appears reasonable as to contact information for defense counsel.  Thus, contact information should be added in the proposed amended notice.  However, it was only in the Reply that plaintiffs proposed the language concerning the role of defense counsel.  Lawyers are officers of the court, and the proposed admonition does not capture that obligation.  *Cf. Irving v. Mississippi*, 441 U.S. 913, 915 (1979); *Nat'l Ass'n for the Advancement of Multijurisdictional Practice v. Lynch*, __F.3d__, No. 15-1982 (4th Cir. June 17, 2016) ("Membership in the bar is a privilege burdened with conditions.") (citations omitted); *United States v. Santana*, 352 Fed. App'x 867, 871 (4th Cir. 2009).  Instead, it could be construed to suggest that defense counsel would deliberately mislead potential plaintiffs.  Accordingly, I decline to approve that language until such time as the parties have an opportunity to confer and to inform the Court as to agreed upon language, if any.

Defendants also argue that, as opposed to the 90-day opt-in period that plaintiffs have suggested, "a notice period of sixty days or less is appropriate . . . ." ECF 28, Opposition, at 15–16. Plaintiffs disagree, arguing that a 90-day notice period is "a standard opt-in period length for FLSA actions in this District, regardless of their size or complexity." ECF 33, Reply, at 18; *see, e.g.*, *Butler*, 876 F. Supp. 2d at 575 (citing various cases that involve 90-day opt-in periods and stating that "[n]otice periods may vary, but numerous courts around the country have authorized ninety day opt-in periods for collective actions"); *Calderon*, RWT-10-1958, 2011 WL 98197, at *2, 8–9 (approving a 90-day notice period); *Cedillos-Guevara*, GLR-14-0196, 2014 WL 7146968, at *4 (same). Defendants have not presented a persuasive basis to deviate from the standard 90-day notice period.

Additionally, defendants dispute plaintiffs' request for phone numbers and email addresses for potential plaintiffs. They argue that doing so places "privacy interests" at risk and that both contact details "would allow ex parte communications with potential opt-in plaintiffs where information provided might differ from any Court-approved notice." ECF 28, Opposition, at 16. Defendants also assert that plaintiffs have not shown a "special need" for this information, which could explain why "posting at the workplace and home mailings are not appropriate or effective." *Id.*

Plaintiffs counter that this information is commonly provided, and that, in any event, they have displayed a special need for this information, because many of the "potential plaintiffs, like them, 'do not speak English as a first language – thus making them harder to contact.'" ECF 33, Reply, at 17–18 (quoting *Ayala v. Tito Contrs.*, 12 F. Supp. 3d 167, 172 (D.D.C. 2014)).

In *Calder v. GGC-Baltimore, LLC*, BPG-12-2350, 2013 WL 3441178, at *3 (D. Md. July 8, 2013), the court said: "So as to facilitate that notice, defendant is directed to supply plaintiffs

with identifying information for the potential plaintiffs, to include full name, last known residential address, and last known e-mail address." Similarly, in *Butler*, 876 F. Supp. 2d at 575 n.17, the court said: "To effectuate this notice, Defendants will be required to produce a file containing the full names and last known home and email addresses of potential opt-in plaintiffs . . . ." *See also Williams*, 585 F. Supp. 2d at 691 ("The Defendant is ordered to produce to the Plaintiffs the employment and wage records, containing names and last known addresses, for all of Defendant's employees, workers, or laborers of any status, from January 2006 to the present.").

I am unpersuaded that plaintiffs require phone numbers for potential plaintiffs in order to provide effective notice of the collective. In particular, I agree with defendants that there are valid privacy considerations with respect to telephone numbers, as well as a potential for deviation from the information in the approved notice if opt-in plaintiffs are contacted by telephone. Moreover, as Judge Russell has explained, although "Plaintiffs state they require potential class members' telephone numbers because the members are semi-literate, they have not demonstrated an inability to contact the members through written notice. Instead, they merely speculate that the notices will not be understood." *Cedillos-Guevara*, GLR-14-0196, 2014 WL 7146968, at *4. The same observation applies here. Accordingly, defendants need not provide telephone numbers for the potential opt-in plaintiffs.

However, "'communication through email is [now] the norm.'" *Butler*, 876 F. Supp. 2d at 566 (quoting *In re Deloitte & Touche, LLP Overtime Litig.*, THK-11-2461, 2012 WL 340114, at *2 (S.D.N.Y. Jan. 17, 2012)) (alteration in *Butler*). Accordingly, where available, defendants shall provide email addresses for potential opt-in plaintiffs.

Defendants also argue that plaintiffs have made no "showing of any special need for posting of the notice form at Defendants' place of business." ECF 28, Opposition, at 17. Plaintiffs urge that this stance is "unwarranted" because "[p]hysical posting of notices at worksites is a standard element of FLSA notice plans in this District" that is refused only in limited circumstances, such as when employees work remotely. ECF 33 at 18 (discussing such a refusal in *Calderon*, RWT-10-1958, 2011 WL 98197, at *8).

In my view, defendants have not advanced a sound argument to restrict this method of notice. *See* ECF 28, Opposition, at 17. Thus, I am persuaded that the court-approved notice of the collective, in its entirety, should be posted at defendants' restaurants because this notice procedure is commonly allowed when potential plaintiffs work in the same physical location. *See, e.g.*, *Randolph*, 7 F. Supp. 3d at 578; *Williams v. ezStorage Corp.*, 2011 WL 1539941, at *3–4 (D. Md. Apr. 21, 2011).

According to defendants, opt-in notices should be returned to the Clerk of Court, rather than to plaintiffs' counsel. *Id.* In their view, directing opt-in plaintiffs to do otherwise "discourages class plaintiffs from retaining their own counsel." *Id.* Defendants do not address the burden that this would place on the Court. Plaintiffs counter that opt-in notices should be sent directly to plaintiffs' counsel to avoid unnecessary delay and burden on the Court. ECF 33, Reply, at 19. To assuage defendants' concern, plaintiffs have also proposed adding the following statement to the amended notice: "You may participate in the suit with attorneys of your own choosing." I agree that the proposed additional language should be included in the Notice.

Defendants advance three additional objections to the Proposed Notice, to which plaintiffs are largely amenable. The objections pertain to a computer-readable database, online notice mechanisms, and the opt-in time frame. *See* ECF 28 at 18–19; ECF 33 at 16–17.

First, defendants contend that they are unable to produce information for potential plaintiffs in a "computer-readable database," as requested by plaintiffs. ECF 28 at 18. Plaintiffs "are willing to receive that information by way of a written response from Defendants if that is all that is available." ECF 33 at 16.

Second, as noted, plaintiffs also seek Court approval to disseminate notice through other means. This includes "permitting them to disseminate notice via two online mechanisms." ECF 25-1 at 19.

In particular, plaintiffs "wish to create a website that contains the Notice in both English and Spanish, as well as a link to download both the Notice and the Opt-In Form" (*id.* at 20), and they "seek to create a Facebook advertisement targeted at 18-65 year-old Spanish-speaking residents of Baltimore City and Baltimore County.[1]" *Id.* Plaintiffs insist that these mechanisms are required because "Defendants' payroll records are unlikely to contain information about many of their former employees who – like several of the Plaintiffs – worked off the books and were paid only in cash." ECF 25-1 at 19. This is apparent from plaintiffs' declarations, noting that employees were paid in cash (*see, e.g.*, ECF 25-4, Mendoza Declaration, ¶ 6; ECF 25-6, W. Rivera Declaration, ¶ 10), and from the FOIA Letter, stating that a compliance review revealed that defendants were "not maintaining time records and payroll for at least 3 years." ECF 33-3 at 6. Thus, plaintiffs argue that "[d]isclosure of those records therefore will not, by itself, facilitate dissemination of notice to all individuals who are eligible to join this suit." *Id.*

Furthermore, plaintiffs "attest that they actively use the internet and social media as a means of searching for and receiving a wide variety of information, such that a notice posted online and via Facebook would be likely to reach the intended audience.[1]" ECF 25-1 at 19–20; *see, e.g.*, ECF 25-5, E. Rivera Declaration, ¶ 19; ECF 25-7, D. Rivera Declaration, ¶ 21.

Defendants do not appear to contest plaintiffs' proposal to create a website. *See* ECF 28 at 15–19. However, defendants do oppose posting a "limited" form of the notice on Facebook in order to reach potential plaintiffs. ECF 28 at 18. They argue that if Facebook is a permissible vehicle for sharing information, the notice should be posted in full to avoid favoring the plaintiffs' position. *Id.* Plaintiffs state that they are "willing to accommodate Defendants' reservations" and have proposed for the "parties to negotiate, and then obtain Court approval for, the abbreviated version of the notice." ECF 33 at 17.

*Woods v. Vector Marketing Corp.*, C-14-0264 EMC, 2015 WL 1198593, at *5 (N.D. Cal. Mar. 16, 2015), upon which plaintiffs rely, is informative. *See* ECF 33 at 17. In *Woods*, "a substantial majority of the potential plaintiffs [were] college-aged." *Woods*, C-14-0264 EMC, 2015 WL 1198593, at *5. Thus, the court noted that email addresses and physical addresses may not "provide a reliable, durable form of contact . . . ." *Id.* Additionally, the court noted that the potential *Woods* plaintiffs were "particularly likely to maintain a social networking presence." *Id.* Accordingly, the court approved the use of Facebook for posting notice, pursuant to its approval of the Facebook ad content. *Id.* at 6, 7.

Plaintiffs also cite *Montoya v. S.C.C.P. Painting Contractors, Inc.*, CCB-07-0455, 2008 WL 554114 (D. Md. Feb. 26, 2008). In that case, now-Chief Judge Blake permitted FLSA plaintiffs to use a website to disseminate notice in the event that the defendant was "unable to provide the plaintiffs with a list of former employees. . . ." *Id.* at 4.

In my view, *Woods* and *Montoya* are sufficiently analogous here so as to justify notice through a website and with a Court-approved Facebook notice.  As noted, plaintiffs claim that the employee records maintained by defendants may not be a reliable source for contact information.  *See* ECF 25-1 at 19. Accordingly, the need to disseminate notice by alternative means is justified, and the use of a website and Facebook are reasonable methods to employ.

Third, and finally, as noted earlier, defendants argue that the time frame for potential plaintiffs to join the collective "should be based on a date three years prior to the date the Court approves any potential notice, not May 19, 2012 . . . ."  ECF 28 at 18.   Plaintiffs "agree to amending the section of the notice of collective action to reflect a date titled 'who can join the lawsuit' to reflect a date three years prior to the date of the notice," which is the date of the issuance of this Memorandum Opinion and its corresponding Order.

The three objections outlined above are well taken.  But, plaintiffs' proposed solutions are equally appropriate.  Accordingly, I will adopt plaintiffs' proposed resolutions.

### III.     Conclusion

For the foregoing reasons, plaintiff's Motion to Certify the Collective (ECF 25) is granted in part and denied in part.   Specifically, I shall grant the portion of the Motion seeking certification of the collective, dating from three years prior to the date of this Memorandum Opinion and its corresponding Order to the present, as to all hourly employees of defendants' six restaurants.  But, the Notice must be revised, and a proposed notice for use on Facebook must be created, as outlined above, and submitted to the Court for approval.  Finally, defendants shall be required to produce the names, dates of employment, e-mail addresses, and last known mailing addresses of the potential collective members, as requested by plaintiffs.

An Order follows.

Date:  June 22, 2016                          /s/
                                        Ellen Lipton Hollander
                                        United States District Judge