IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ERICK RIVERA et al.,

    *Plaintiffs, on behalf of themselves
and others similarly situated,*

    v.

MO'S FISHERMAN EXCHANGE, INC.
et al.,

    *Defendants.*

Civil Action No. ELH-15-1427

## MEMORANDUM OPINION

In a Second Amended Complaint (ECF 108), plaintiffs Erick Rivera, Edwin Garcia Sosa, Pierre Etheridge, and Dallas Royer, on behalf of themselves and others similarly situated, filed a wage action against seven corporations that operate six restaurants at which plaintiffs previously worked: Mo's Fisherman's Exchange, Inc. (d/b/a Mo's and Mo's Towson); Mo's Pulaski Highway Corp. (d/b/a Mo's White Marsh, Mo's Seafood Restaurant, and Mo's); Mo's Crab and Pasta Factory, Inc. (d/b/a Mo's Crab & Pasta and Mo's Little Italy); Mo's Belair Seafood, Inc. (d/b/a Mo's Fisherman's Wharf and Mo's Inner Harbor);[1] Mo's Fisherman's Ritchie Highway, Inc. (d/b/a Mo's Seafood Factory); Mo's Eastern Avenue, Inc. (d/b/a Mo's Seafood Factory Neighborhood Bar & Grill, and Mo's Neighborhood Bar & Grill); and Fisherman's Wharf Inner Harbor, Inc. (d/b/a Mo's Fisherman's Wharf and Mo's Inner Harbor). ECF 108, ¶¶ 12-18. Plaintiffs also sued defendant Mohammed S. Manocheh, who owns and operates each of the restaurants. *Id.* ¶¶ 19, 28. I shall refer to defendants collectively as "Mo's."

In particular, plaintiffs allege violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*; the Maryland Wage and Hour Law ("MWHL"), Md. Code (2016 Repl.

---

[1] It appears that Mo's Belair Seafood, Inc. did not operate an independent restaurant location, but rather operated the Inner Harbor location for some period.

Vol.), §§ 3-401 *et seq.* of the Labor and Employment Article ("L.E."); and the Maryland Wage Payment and Collection Law ("MWPCL"), L.E. §§ 3-501 *et seq.* ECF 108, ¶ 1. They assert, *inter alia*, that defendants willfully failed to pay plaintiffs the wages due and owing, including minimum wages and overtime wages. *Id.*

Plaintiffs subsequently moved to certify the FLSA claim as a collective action under 29 U.S.C. § 216(b). ECF 25. The motion was vigorously litigated. *See* ECF 28; ECF 33. By Memorandum Opinion (ECF 37) and Order (ECF 38) of June 23, 2016, I granted conditional certification.[2] Thereafter, numerous individuals opted into the suit. The case has also been voluntarily dismissed as to many plaintiffs, including the original named plaintiff, Melvin Mendoza. *See* ECF 112.

Four motions are now pending; this Memorandum Opinion addresses three of them. Defendants have filed a motion to decertify the collective action, asserting that plaintiffs are not similarly situated. ECF 139. The motion is supported by a memorandum of law (ECF 139-2) (collectively, "Motion to Decertify") and voluminous exhibits. Plaintiffs oppose the Motion to Decertify (ECF 144) and have submitted many exhibits. Defendants replied. ECF 145.

Also pending are the parties' cross-motions for partial summary judgment. Plaintiffs moved for partial summary judgment on the issues of defendant Manocheh's personal liability under the FLSA and defendants' ability to claim a "tip credit" under the FLSA. ECF 140 (motion); ECF 140-1 (memorandum of law) (collectively, "Plaintiffs' Motion"). Plaintiffs' Motion is accompanied by thirty-four exhibits. Defendants have filed a combined opposition to Plaintiffs' Motion and a cross-motion for partial summary judgment on the issues of defendants' eligibility for the "tip credit" and plaintiffs' entitlement to overtime wages prior to July 1, 2014.

---

[2] The suit has not been certified as a class action under Fed. R. Civ. P. 23.

ECF 142 ("Defendants' Motion").  Defendants' Motion is accompanied by thirty-seven exhibits.

Plaintiffs oppose Defendants' Motion, and replied in support of their own, with several exhibits.

ECF 146.  Thereafter, defendants replied.  ECF 147.

In addition, plaintiffs have filed a Motion for Sanctions for Spoliation of Evidence.  ECF

132.  That motion is not addressed in this Memorandum Opinion.

No hearing is necessary to resolve the three motions.  *See* Local Rule 105.6.  For the

reasons that follow, I shall deny the Motion to Decertify; I shall grant Plaintiffs' Motion in part

and deny it in part; and I shall grant Defendants' Motion in part and deny it in part.

## I.     Background

### A.  Factual and Procedural Background

Plaintiffs Melvin Mendoza, Erick Rivera, and Armando Portillo filed the initial

Complaint on May 19, 2015.  ECF 1.  Defendants answered on November 3, 2015.  ECF 13.

The action was conditionally certified on June 22, 2016.  ECF 38.  An Amended Complaint was

filed on March 21, 2017 (ECF 87), and the Second Amended Complaint was docketed July 19,

2017.  ECF 108.  Since then, quite a number of named and opt-in plaintiffs were voluntarily

dismissed.  *See* ECF 111, ECF 112, ECF 114.

According to plaintiffs, there are currently 30 plaintiffs in the case, all of whom are

former employees of Mo's.  *See* ECF 140-1 at 18.  They were employed in various positions,

including as servers, bartenders, busboys, food preparers, cooks, and dishwashers.  *See* ECF 144

at 12, 12-13 n.29-34.[3]  The majority of plaintiffs received tips.  Therefore, those individuals were

paid at a below-minimum wage rate.  *See* ECF 140-3 (defendants' responses to plaintiffs'

---

[3] Plaintiffs and defendants frequently cite to the interrogatories of the individual plaintiffs in their brief to support their contentions.  For the sake of efficiency and convenience, I will not reproduce the lengthy citations here, and will instead cite to the briefs.

interrogatories) at 6-8.  However, they allege that their tips were frequently withheld or taken by defendants, either because defendants deducted a 3% credit card processing fee from their tips, or because plaintiffs were required to reimburse the restaurants for their customers' unpaid bills. *See* ECF 144 at 14, 14 n.41, 14 n.42.

Many plaintiffs claim unpaid overtime wages.  They allege that during certain weeks they worked more than forty hours, but were not paid time-and-a-half wages for their overtime hours. *See id.* at 12, 12 n.27-28.  In addition, plaintiffs allege that they were denied their straight-time wages for extended periods.  *See id.* at 16, 16 n.52.[4]  For example, several plaintiffs have alleged that they were not paid any wages during their training periods, which often lasted multiple weeks.  *Id.* at 16 n.53-54.

Additional facts are included in the Discussion.

### B.  Wage Statutes

#### 1.  The FLSA

Congress enacted the FLSA in 1938 "to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'"  *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) (quoting 29 U.S.C. § 202(a))  (alterations  in  *Barrentine*);  *see  Encino  Motorcars,  LLC  v.  Navarro*, ___U.S.___, 136 S. Ct. 2117, 2121 (2016); *Morrison v. Cnty. of Fairfax, Va.*, 826 F.3d 758, 761 (4th Cir. 2016); *see also McFeeley v. Jackson Street Entertainment, LLC*, 825 F.3d 235, 240 (4th Cir. 2016) ("Congress enacted the FLSA to protect 'the rights of those who toil, of those who

---

[4] "Straight-time wages" refer to an employee's regular, non-overtime pay.

sacrifice a full measure of their freedom and talents to the use and profit of others.'") (citations omitted).

Among its provisions, "the FLSA requires employers to pay overtime to covered employees who work more than 40 hours in a week." *Encino Motorcars, LLC v. Navarro*, ___ U.S. ___, 138 S. Ct. 1134, 1138 (2018) (citation omitted); *see Perez v. Mortgage Bankers Ass'n*, ___U.S.___, 135 S. Ct. 1199, 1204 (2015), *Integrity Staffing Solutions, Inc. v. Busk*, ___U.S.___, 135 S. Ct. 513, 516 (2014); *see also Harbourt v. PPE Casino Resorts Md., LLC*, 820 F.3d 655, 658 (4th Cir. 2016) ("The FLSA requires that employers pay employees the minimum hourly wage 'for all hours worked.'") (quoting *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 363 (4th Cir. 2011)).  In particular, the FLSA has established the "general rule that employers must compensate each employee 'at a rate not less than one and one-half times the regular rate' for all overtime hours that an employee works." *Darveau v. Detecon, Inc.*, 515 F.3d 334, 337 (4th Cir. 2008) (quoting 29 U.S.C. § 207(a)(1)).

Thus, the FLSA is now "best understood as the 'minimum wage/maximum hour law." *Trejo v. Ryman Hospitality Properties, Inc.*, 795 F.3d 442, 446 (4th Cir. 2015) (citation omitted). As the Fourth Circuit said in *Monahan v. Cnty. of Chesterfield, Va.*, 95 F.3d 1263, 1266-67 (4th Cir. 1996): "The two central themes of the FLSA are its minimum wage and overtime requirements. . . .  The FLSA is clearly structured to provide workers with specific minimum protections against excessive work hours and substandard wages." (Internal quotations omitted).

### 2.  State Statutes

Generally, the MWHL governs minimum wages and overtime.  *See* L.E. §§ 3-413, 3-415, 3-420.  It authorizes an employee to bring an action against an employer to recover unpaid wages due under the statute.  L.E. § 3-437.  *See generally Friolo v. Frankel*, 373 Md. 501, 819 A.2d

354 (2005). The term "wage" is defined as "all compensation that is due to an employee for employment." L.E. § 3-401(d).

The MWPCL, also known as the Wage Act, "sets *specific terms* for payment mandated elsewhere in the Wage and Hour Law." *Campusano v. Lusitano Construction, LLC*, 208 Md. App. 29, 37, 56 A.2.3d 303, 308 (2012) (emphasis in *Campusano*). Like the MWHL, the MWPCL provides an employee with the right to bring a civil suit against an employer to recover unpaid wages. *See* L.E. § 3-507.2(a);[5] *Baltimore Harbor Charters, Ltd. v. Ayd*, 365 Md. 366, 382-83, 780 A.2d. 303, 312-13 (2001); *Mohiuddin v. Doctor's Billing & Management Solutions, Inc.*, 196 Md. App. 439, 446, 9 A.3d 859, 863 (2010) (citations omitted).

The Wage Act "protects employees from wrongful withholding of wages upon termination." *Stevenson v. Branch Banking and Trust Corporation, t/a BB&T*, 159 Md. App. 620, 635, 861 A.2d 735, 743 (2004) (citing L.E. § 3-505). "The principal purpose of the Act 'was to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages.'" *Medex v. McCabe*, 372 Md. 28, 39, 811 A.2d 297, 304 (2002) (citation omitted). The Wage Act does not focus on "the amount of wages payable but rather the duty to pay whatever wages are due on a regular basis and to pay all that is due following termination of the employment." *Friolo*, 373 Md. at 513, 819 A.2d at 362.

The term "wage" includes commissions, bonuses when they are compensation for services and not a gratuity, and work-related incentive fees. L.E. § 3-501(c)(2); *see Medex*, 372 Md. at 35-37, 811 A.2d at 302; *Whiting-Turner v. Fitzpatrick*, 366 Md. 295, 306; 783 A.2d 667, 673 (2001). If "a court finds that an employer withheld the wages of an employee in violation of [the MWPCL] and not as a result of a bona fide dispute, the court may award the employee an

---

[5] This provision was previously codified at L.E. § 3-507.1. *See* Section 1, Ch. 151, Acts of 2010.

amount not exceeding 3 times the wage, and reasonable counsel fees and other costs." L.E. § 3-507.1(b).

## II.    Motion to Decertify

"Under the FLSA, plaintiffs may maintain a collective action against their employer for violations under the act pursuant to 29 U.S.C. § 216(b)." *Quinteros v. Sparkle Cleaning, Inc.*, 532 F. Supp. 2d 762. 771 (D. Md. 2008).  Section 216(b) states, in pertinent part:

> An action . . . may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Thus, § 216(b) "establishes an 'opt-in' scheme, whereby potential plaintiffs must affirmatively notify the court of their intentions to be a party to the suit." *Quinteros*, 532 F. Supp. 2d at 771.

Pursuant to § 216(b), "[d]eterminations of the appropriateness of conditional collective action certification and court-facilitated notice are left to the court's discretion." *Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, 686 (D. Md. 2010).  Generally, when assessing whether to certify a collective action pursuant to the FLSA, district courts in this circuit adhere to a two-stage process.  *See, e.g.*, *Butler v. DirectSAT USA, LLC*, 876 F. Supp. 2d 560, 566 (D. Md. 2012); *see also Flores v. Unity Disposal & Recycling, LLC*, GJH-15-196, 2015 WL 1523018, at *2-3 (D. Md. Apr. 2, 2015); *Rawls v. Augustine Home Health Care, Inc.*, 244 F.R.D. 298, 300 (D. Md. 2007).

"In the first stage, commonly referred to as the notice stage, the court makes a threshold determination of whether the plaintiffs have demonstrated that potential class members are similarly situated, such that court-facilitated notice to putative class members would be appropriate." *Butler*, 876 F. Supp. 2d at 566 (internal quotations omitted).  The second stage is

sometimes referred to as the decertification stage. *Id.* "In the second stage, following the conclusion of discovery, the court engages in a more stringent inquiry to determine whether the plaintiff class is [in fact] similarly situated in accordance with the requirements of § 216, and renders a final decision regarding the propriety of proceeding as a collective action." *Syrja*, 756 F. Supp. 2d at 686 (internal quotations and citations omitted) (alterations in *Syrja*). The Motion to Decertify pertains to the second stage.

"Generally, plaintiffs bear the burden of showing that their claims are 'similarly situated,' but courts have ruled that 'similarly situated' need not mean 'identical.'" *Gionfriddo v. Jason Zink, LLC*, 769 F. Supp. 2d 880, 886 (D. Md. 2011) (citation omitted). "Essentially, collective action members are similarly situated when there are 'issues common to the proposed class that are central to the disposition of the FLSA claims and that such common issues can be substantially adjudicated without consideration of facts unique or particularized as to each class member.'" *Randolph v. PowerComm Const., Inc.*, 309 F.R.D. 349, 368 (D. Md. 2015) (quoting *LeFleur v. Dollar Tree Stores, Inc.*, 30 F. Supp. 3d 463, 468 (E.D. Va. 2014)).

District courts have "broad discretion to determine whether a collective action is an appropriate means for prosecuting an FLSA cause of action." *Gionfriddo*, 769 F. Supp. 2d at 886. In making this determination, "courts have considered three factors: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Randolph*, 309 F.R.D. at 368 (citation and internal quotation marks omitted).

Defendants argue that all three of these factors point toward decertification. *See* ECF 139-2.

## A. Factual and Employment Settings of the Plaintiffs

Defendants maintain that plaintiffs cannot prove they were "'victims of a common policy or plan that violated the law'" because, in essence, plaintiffs' allegations rest on multiple, partially overlapping violations of the FLSA. *See* ECF 139-2 at 11 (quoting *Marroquin v. Canales*, 236 F.R.D. 257, 260 (D. Md. 2006)). According to defendants, plaintiffs "cannot prove that Mo's used a company-wide policy of failing to advise Plaintiffs of their tip credit rights . . . because a large number of Plaintiffs admitted they . . . were properly advised of their tip credit rights." ECF 139-2 at 12-13. It appears that, of the 25 tipped-employee plaintiffs, nine were timely informed of their tip credit rights, six plaintiffs were belatedly informed of their tip credit rights, and ten never received notice at all. *See* ECF 144 at 13-14.

Further, defendants claim that there is "no evidence that Mo's implemented or used a company-wide policy of refusing to pay overtime to employees," because "several Plaintiffs . . . were paid overtime wages, at least during certain weeks, and seven Plaintiffs are not even pursuing unpaid overtime claims." ECF 139-2 at 13. Defendants also assert that many of plaintiffs' overtime claims are contradicted by defendants' records for their Point-of-Sale system. *Id.* at 14.

According to defendants, there could not have been a company-wide policy of not paying straight wages for non-overtime hours because "less than half of the Plaintiffs claim that they were not paid their straight wages for several weeks or months" (ECF 139-2 at 16), and not all plaintiffs (25 of 30) claim that they were not paid their straight wages for the hours they worked. *Id.* at 14. Defendants make the same argument as to claims based on tip misappropriation and deductions, emphasizing: "Plaintiffs tell different stories about how Defendants violated the law, but none of the allegations apply to more than a handful of Plaintiffs." *Id.* at 16-17.

Plaintiffs nimbly deflect these assertions, observing: "If pursuing multiple FLSA claims were a bar to collective liability, Defendants would be rewarded for violating the law in numerous ways." ECF 144 at 7. Nor does the fact that not all plaintiffs join in all claims require decertification. "If common questions predominate, the plaintiffs may be similarly situated even though the recovery of any given plaintiff may be determined by only a subset of those common questions." *Alvarez v. City of Chicago*, 605 F.3d 445, 449 (7th Cir. 2010).

At its core, this case concerns three issues: the denial of overtime pay; the misappropriation of plaintiffs' tips; and the failure to pay a minimum wage. Plaintiffs have presented evidence that, of the 24 plaintiffs who allegedly worked more than forty hours in a week, all of them were denied at least some of their overtime pay. *See* ECF 144 at 19, 19 n.59. Defendants cannot defeat this claim by citing a few instances in which overtime was paid. Rather, as plaintiffs point out, "[i]f some Plaintiffs did in fact receive overtime pay sporadically, their recovery will be reduced by that amount." ECF 144 at 25.

Plaintiffs also present evidence that defendants systematically (if not universally) underpaid plaintiffs by (1) improperly taking a tip credit to reduce their hourly wage, in violation of 29 U.S.C. § 203(m) (either through the failure to inform plaintiffs of their tip credit rights or by unlawfully retaining portions of their tips) (*see* ECF 144 at 27-30), or (2) simply failing to pay wages earned for hours worked. *Id.* at 31-32. The former set of alleged minimum wage violations allegedly affected 24 of the 25 tipped plaintiffs (*see id.* at 13-14, 13 n.38, 14 n.39; ECF 139 at 4-9), and the latter allegedly affected ten plaintiffs. *See* ECF 144 at 16, 16 n.52.

Moreover, defendants' assertion that there is no company-wide policy that can sustain plaintiffs' collective FLSA claims is weakened by the undisputed fact that defendants' payroll

system for all six restaurants is controlled by only three people: Manocheh and two bookkeepers. *See* ECF 139 at 2-3, 2 n.2-5.

## B. Individualized Defenses

Defendants claim that they will need to "present different defenses for each individual plaintiff, depending on where they worked, when they worked, and whether they were tipped employees or non-tipped employees." ECF 139-2 at 21. They emphasize that "the lack of documentation of many of the allegations and claims" will require "the testimony of each Plaintiff and their managers." *Id.* at 22. According to defendants, this means that certification is not appropriate. *Id.* at 21-22.

I disagree. First, to the extent that plaintiffs' claims are difficult to adjudicate because defendants lack proper documentation of plaintiffs' work, defendants should not benefit from their lax accounting. Second, several of defendants' defenses appear to concern the amount of damages rather than the question of liability. *See* ECF 139-2 at 21 ("for approximately half of the Plaintiffs, Defendants will be presenting detailed, fact-based defenses based on time records"). Of course, the existence of a dispute of fact as to the number of overtime hours worked does not justify decertification. Moreover, "a collective action does not prohibit individualized inquiry in connection with fashioning the specific relief or damages to be awarded to each class member. Testimony regarding dates, hours and pay rate does not affect certification of the collective action or impact the determination of whether [defendants'] practices violate the FLSA . . . ." *Randolph*, 309 F.R.D. at 369 (internal citations and quotation marks omitted).

### C. Fairness and Procedural Concerns

In the context of the third factor, fairness and procedural concerns, defendants renew their argument concerning the multiple legal theories of recovery for plaintiffs, and submit that presenting these arguments together would "confuse and prejudice the jury against Defendants and result in an unmanageable trial." ECF 139-2 at 23. Moreover, defendants assert that, if the collective were decertified, plaintiffs would have no trouble finding attorneys in the Baltimore area who would take their cases on an individual basis, given plaintiffs' projected individual recovery. *Id.* Defendants even name four such attorneys whom they suggest "would be willing to take such cases to court." *Id.* at 23-24.

Plaintiffs dispute the contention that their claims "are best decided in 30 individual trials involving the same witnesses, the same evidence, and the same issues of liability." ECF 144 at 36. They assert, *id.* at 37: "Given the plethora of common issues, not to mention the risk of inconsistent adjudications . . . , litigating Plaintiffs' claim [sic] in a single proceeding is the fairer and more efficient alternative." Similarly, plaintiffs argue that filing individual cases would "drive up costs on all sides and waste resources." *Id.* at 41. Instead, following defendants, plaintiffs suggest division of the action into four subclasses, based on different alleged FLSA violations. *Id.* at 37-40. Plaintiffs also point out that "no party has requested a jury," and they maintain that "this Court is of course well-equipped to handle a bench trial involving sub-classes." *Id.* at 40.

I am persuaded that it is appropriate to divide the case into three subclasses or groups: (1) plaintiffs who claim unpaid overtime wages; (2) plaintiffs who claim their tips were illegally withheld or stolen; and (3) plaintiffs who claim they were not paid straight wages for extended periods. Dividing plaintiffs into separate groups will reduce the risk of confusion and promote

effective claim management. *See* ECF 139-2 at 23. And, I have the authority to divide the members of the collective into groups, for convenience. *See Alvarez*, 605 F.3d at 449-50; *Rawls*, 244 F.R.D. at 302; *see also* Fed. R. Civ. P. 83.

Each of these three subclasses could have achieved certification independently. But, it is not necessary to decertify them simply because plaintiffs initially sought pre-discovery certification on a common basis. Grouping the plaintiffs will spare the parties, as well as the Court, the unnecessary burden of multiple trials involving much of the same evidence. The details of the mechanics need not be resolved at this time.

### III.     Motions for Summary Judgment

Plaintiffs move for summary judgment on two issues: (1) Manocheh's individual liability as an employer of plaintiffs, and (2) defendants' entitlement to invoke the FLSA's tip credit provisions under 29 U.S.C. § 203(m). ECF 140. Defendants oppose Plaintiffs' Motion, and move for summary judgment on three similar issues: (1) defendants' right to deduct a 3% credit card processing fee from plaintiffs' tips, (2) defendants' right to claim a wage credit for service charges paid to bartenders and servers, and (3) plaintiffs' entitlement to overtime wages under state law for hours worked prior to July 1, 2014. ECF 142.

For the reasons that follow, I shall deny Plaintiffs' Motion as to Manocheh's liability, defendants' 3% credit card deduction, and defendants' policy of using plaintiffs' tips to cover customers' checks. But, I shall grant it in part as to defendants' failure to provide a tip credit notice to 16 plaintiffs. As for Defendants' Motion, I shall grant it only as to the third issue, regarding overtime pay under the MWHL prior to July 1, 2014, which plaintiffs concede.

## A. Legal Standard

Both parties have moved for partial summary judgment under Fed. R. Civ. P. 56. Under Rule 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club,*

*Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)); *see also Celotex*, 477 U.S. at 322-24. Moreover, in resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). However, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the

parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). Simply because both parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate. "Both motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Wright, Miller & Kane, *Federal Practice & Procedure* § 2720, at 336-37 (3d ed. 1998, 2012 Supp.).

### B. Manocheh's Personal Liability

### 1. FLSA

Plaintiffs move for summary judgment on the issue of whether Manocheh is their "employer" under the FLSA. ECF 140-1 at 28-35. The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Notably, "[i]t is well settled that an individual may qualify as an employer and face liability under the FLSA." *Roman v. Guapos III, Inc.*, 970 F. Supp. 2d 407, 416 (D. Md. 2013). The Fourth Circuit has stated that the FLSA "should be broadly interpreted and applied to effectuate its goals," *Purdham v. Fairfax Cty. Sch. Bd.*, 637 F.3d 421, 427 (4th Cir. 2011), and the definition of "employer" is already broad.

"In determining whether an individual is an employer for purposes of the FLSA, '[t]he overarching concern is whether [he] possessed the power to control the workers in question.'" *Prusin v. Canton's Pearls, LLC*, JKB-16-0605, 2017 WL 5126156, at *11 (D. Md. Nov. 6, 2017) (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)) (alteration in *Prusin*). This determination is reached with reference to four factors, none of which is dispositive: "whether the alleged employer (1) had the power to hire and fire the employees, (2)

supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Prusin*, 2017 WL 5126156, at *11 (citations omitted). *See Speert v. Proficio Mortgage Ventures, LLC*, JKB-10-718, 2011 WL 2417133, at *3 (D. Md. June 11, 2011). Overall, the court should look to the "economic reality of an individual's status as an employer," which may include other factors, such as financial interest in the enterprise and job description. *Gionfriddo v. Jason Zink, LLC*, 769 F. Supp. 2d 880, 890 (D. Md. 2011).

It is undisputed that Manocheh is the sole owner of all the corporate entities that operate the restaurants. *See* ECF 140-15 (Deposition of Mohammed S. Manocheh) at 21-22. And, plaintiffs assert that he exercises significant operational control over the enterprise. ECF 140-1 at 28. They point out that the restaurants bear his nickname ("Mo's") (*id.* at 28), that he develops the menu (*see* ECF 140-15 at 49), and authorizes purchases. *See* ECF 140-16 (Deposition of manager Farhad Jafari) at 10. Only Manocheh and his two bookkeepers have authority to write checks for the restaurants. *See* ECF 140-15 at 12-15. According to the bookkeepers, Manocheh personally approves pay increases for employees. *See* ECF 140-17 (Deposition of Teri Ruth) at 31; ECF 140-19 (Deposition of Susan Wille) at 20. Moreover, Manocheh admitted that he "could" hire employees, but stated that he does not "have patience" to do so. ECF 140-15 at 55. However, two plaintiffs submitted affidavits stating that Manocheh was involved in their hiring (*see* ECF 140-27, Deposition of William Rivera, at 3; ECF 140-28, Deposition of Kelly Wolf, at 3), although defendants appear to dispute Manocheh's involvement. *See* ECF 142 at 22.

The thrust of plaintiffs' argument is that Manocheh's ability to exercise control, even if he chooses not to do so, makes him liable as an employer. Further, plaintiffs attach no

significance to Manocheh's limited direct contact with employees.  *See* ECF 146 at 9-10 (citing

*Irizarry v. Catsimidatis*, 722 F.3d 99, 110 (2d Cir. 2013)).  Plaintiffs point out that Manocheh

admits he occasionally directs employees—"whoever is around"—to perform a task at one of the

restaurants, like cleaning outside and getting deliveries.  *See* ECF 140-15 at 31, 36.   In

Manocheh's deposition, he was asked if he recalled "a single instance in which an employee

refused to do whatever [Manocheh] had asked them to do."  *Id.* at 68.  He responded, *id*. at 68-

69, "They don't have the balls not to do. . . . Told them they work for me."

In the context of the FLSA and individual defendants, the First Circuit in *Baystate*

*Alternative Styling v. Herman*, 163 F.3d 668, 677 (1st Cir. 1998), observed that "the language of

[FLSA] does not support the proposition that officers of a corporation can never be held

personally liable for unpaid wages, and . . . that Congress intended the FLSA's reach to

transcend traditional common law parameters of the employer-employee relationship." (Citing

*Donovan v. Agnew*, 712 F.2d 1509 (1st Cir. 1983)).  In determining personal liability, a court

must look to the "economic reality" of the situation, rather than to "technical" common law

concepts." *Id.* (citing *Agnew*, 712 F.2d at 1514).  In this regard, the court noted the relevance of

"the significant ownership interest of the corporate officers; their operational control of

significance to Manocheh's limited direct contact with employees.  *See* ECF 146 at 9-10 (citing

*Irizarry v. Catsimidatis*, 722 F.3d 99, 110 (2d Cir. 2013)).  Plaintiffs point out that Manocheh

admits he occasionally directs employees—"whoever is around"—to perform a task at one of the

restaurants, like cleaning outside and getting deliveries.  *See* ECF 140-15 at 31, 36.   In

Manocheh's deposition, he was asked if he recalled "a single instance in which an employee

refused to do whatever [Manocheh] had asked them to do."  *Id.* at 68.  He responded, *id*. at 68-

69, "They don't have the balls not to do. . . . Told them they work for me."

Nevertheless, defendants maintain that the "economic reality" of the situation is that

Manocheh did not act as an employer with respect to plaintiffs.  ECF 142 at 20-21.  According to

defendants, the individual managers of the restaurants acted as plaintiffs' employers, deciding

whom to hire and fire, setting plaintiffs' schedules, and determining pay rates.  *See* ECF 142 at 9,

9 n.1-3.  Defendants contend that Manocheh visited some restaurants only rarely (*see* ECF 142-

31 at 6), and that employment policies and human resources issues, including record-keeping,

were handled by other personnel.  *See* ECF 142 at 12-13, 13 n.23-28.

In the context of the FLSA and individual defendants, the First Circuit in *Baystate*

*Alternative Styling v. Herman*, 163 F.3d 668, 677 (1st Cir. 1998), observed that "the language of

[FLSA] does not support the proposition that officers of a corporation can never be held

personally liable for unpaid wages, and . . . that Congress intended the FLSA's reach to

transcend traditional common law parameters of the employer-employee relationship." (Citing

*Donovan v. Agnew*, 712 F.2d 1509 (1st Cir. 1983)).  In determining personal liability, a court

must look to the "economic reality" of the situation, rather than to "technical" common law

concepts." *Id.* (citing *Agnew*, 712 F.2d at 1514).  In this regard, the court noted the relevance of

"the significant ownership interest of the corporate officers; their operational control of

significant aspects of the corporation's day to day functions, including compensation of employees[]; and the fact that they personally made decisions to continue operating the business despite financial adversity and the company's inability to fulfill its statutory obligations to its employees." *Baystate*, 163 F.3d at 677-78.

Here, Manocheh is the sole owner of the enterprise, and he has ultimate control. But, by choice, he has limited his role in day-to-day employment matters. As such, the case is distinct from *Prusin*, 2017 WL 5126156, at * 13, where the individual defendant "actually *exercised* authority over employees" (emphasis in original), and from *Alvarez-Soto v. B. Frank Joy, LLC*, 258 F. Supp. 3d 615, 630 (D. Md. 2017), where the individual defendants were merely alleged to be "corporate officers" who "had knowledge of the matters" alleged in the complaint. Nor is Manocheh the "absentee owner," whose activities related only to his financial interest in the business. *See Whyte v. PP & G, Inc.*, WMN-13-2806, 2015 WL 3441955, at *3-4 (D. Md. May 26, 2015).

The facts here are analogous to those in *Jackson v. Egira, LLC*, RDB-14-3114, 2016 WL 1558136 (D. Md. Apr. 18, 2016), and *Irizarry v. Catsimatidis*, 722 F.3d 99.

In *Jackson*, 2016 WL 1558136, plaintiff employees sued, among others, the owner of a restaurant at which they worked. *Id.* at *5. Plaintiffs argued that because the defendant was authorized to sign checks, and could have controlled the restaurant's payroll practices, he should be held liable as a matter of law, and they sought summary judgment on this issue. *Id.* The defendant presented a "conflicting account of the payroll and supervisory policies" of the business. *Id.* Judge Bennett of this Court found that genuine disputes of fact existed as to the nature of the defendant's role in the business. *Id.* Therefore, he decided that the owner's "status as an 'employer' under the FLSA is thus a determination best left for trial." *Id.*

In *Irizarry*, 722 F.3d 99, a group of employees sued John Catsimatidis, the chairman and CEO of the Gristede's supermarket chain in New York, alleging FLSA violations. *Id.* at 102. The plaintiffs moved for summary judgment, seeking a declaration that Catsimatidis was personally liable as an employer. *Id.* The record showed that Catsimatidis made "big picture" decisions regarding the business, *id.* at 112, but would also visit the stores to address problems and instruct managers and employees to keep the stores clean and restock items. *Id.* at 113-14. Catsimatidis acknowledged that he had the ability to hire and fire employees, but stated that he had not recently done so. *Id.* at 114. The evidence also suggested that Catsimatidis was at least somewhat aware of payroll issues, and worked in the same office in which the employment records were kept, but did not personally keep them or determine pay rates for most employees. *Id.* at 115-16. However, Catsimatidis admitted that he had financial control of the business and could shut it down if he wanted to. *Id.* at 115.

The district court granted summary judgment to the plaintiffs, and Catsimatidis appealed. *Id.* The Second Circuit affirmed. Applying the four-factor "economic reality" test, the Second Circuit found that two of the four factors—ability to hire and fire, and financial control—pointed in favor of employer status. *Id.* at 116. Under the "totality of the circumstances," the court determined that Catsimatidis possessed and exercised operational control over the plaintiffs' employment and was therefore an employer. *Id.* Nevertheless, the court recognized "that the facts . . . make for a close case." *Id.*

Guided by these cases, I shall decline to grant summary judgment. Certainly, like Catsimatidis in *Irizarry*, Manocheh possessed the ability to hire and fire, and he has financial control of the enterprise. Indeed, Manocheh's interactions with employees, especially his occasional directives to them and his attention to restaurant finances, may indicate that

Manocheh is more clearly an "employer" with respect to plaintiffs than Catsimatidis. However, the extent of Manocheh's involvement in the employment side of the business appears to be disputed. For example, defendants assert that Manocheh had "very little, if anything, to do with the day-to-day" operations of the restaurants, and is "at the top of the chain" only "on paper" and "in name," while the managers run everything. ECF 142-29 at 14. As a result, I cannot conclude, as a matter of law, that Manocheh is an employer with respect to plaintiffs for purposes of the FLSA.

### 2. State Statutes

Plaintiffs also move for summary judgment under the Maryland statutes as to the issue of whether Manocheh is their employer.[6]

The MWHL is the "State parallel" of the FLSA. *See Newell v. Runnels*, 407 Md. 578, 649, 967 A.2d 729, 771 (2009). It authorizes an employee to sue for unpaid wages. L.E. § 3-427.

In the MWHL, "employer" is defined to include "a person who acts directly or indirectly in the interest of another employer with an employee." L.E. § 3-401(b). And, as indicated it defines "wage" as "all compensation that is due to an employee for employment." L.E. § 3-401(d). The definition of "employer" under the MWHL is "expansive," and is not limited by the common law concept. *Newell*, 407 Md. at 649, 967 A.2d at 773. Indeed, the *Newell* Court observed that an employee "may have more than one employer at a given time." *Id.*

Maryland courts use the same four-factor "economic reality" test that federal courts have used in considering whether an individual is an employer under the FLSA. *See Prusin*, 2017 WL

---

[6] The parties barely discuss this question with respect to the Maryland statutes. Plaintiffs discuss the statutes only in footnotes (*see* ECF 140 at 22-23 n.97, 23 n.98), and defendants do not appear to cite any Maryland cases on this subject at all.

5126156, at *11; *Newell*, 407 Md. at 651, 967 A.2d at 772. But, as the *Newell* Court recognized, "[t]he economic reality test is fluid and often articulated differently by different courts." 407 Md. at 651, 967 A.2d at 772. *See also McFeeley*, 47 F. Supp. 3d at 273; *Turner v. Human Genome Sci., Inc.*, 292 F. Supp. 2d 738, 744 (D. Md. 2003) ("The requirements under the MWHL mirror those of the federal law; as such, Plaintiffs' claim under the MWHL stands or falls on the success of their claim under the FLSA."). Accordingly, I shall deny Plaintiffs' Motion as to the MWHL, for the same reasons.

The MWPCL also provides an employee with the right to bring a civil suit against an employer to recover unpaid wages. *See* L.E. § 3-507.2(a); *Mohiuddin*, 196 Md. App. at 446, 9 A.3d 863. As noted, the term "wage" in the MWPCL includes commissions, bonuses when they are compensation for services and not a gratuity, and work-related incentive fees. L.E. § 3-501(c)(2); *see Medex*, 372 Md. at 35-37, 811 A.2d at 302.

The Wage Act does not define "employee." An "employer" within the purview of the Wage Act includes "any person who employs an individual in the State or a successor of the person." L.E. § 3-501(b). The term "employ" means "to engage an individual to work," L.E. § 3-101(c)(1), including "allowing an individual to work" and "instructing an individual to be present at a work site." L.E. § 3-101(c)(2)(i) and (ii). However, a "mere supervisor" is not an employer within the meaning of the Wage Act. *Watkins v. Brown*, 173 F. Supp. 2d 409, 415-16 (D. Md. 2001); *see also Bouthner v. Cleveland Construction, Inc.*, RDB-11-244, 2011 WL 2976868, at *7 (D. Md. Jul. 21, 2011); *Hosack v. Utopian Wireless Corp.*, DKC-11-420, 2011 WL 1743297, *5 (D. Md. May 6, 2011).

The MWPCL is "'technically narrower'" than the MWHL in its definition of an "employer." *See Hall v. DIRECTV, LLC*, 846 F.3d 757, 775 n.10 (4th Cir. 2017) (citation

omitted), *cert. denied*, 138 S. Ct. 635 (2018); *compare* 29 U.S.C. § 203(d) (FLSA, defining "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . .") *with* L.E. § 3-501(b) (MWPCL, defining "employer" to include "any person who employs an individual . . . or a successor of the person"). In any event, courts have used the "economic realities" test to determine the employer-employee relationship for purposes of the MWPCL. *See, e.g.*, *Carollo v. Fed. Debt Assistance Ass'n, LLC*, RDB-17-1220, 2017 WL 4236734, at *3 (D. Md. Sept. 25, 2017).

In analyzing the parameters of an "employer" under the MWPCL, the case of *Campusano v. Lusitano Construction, LLC*, 208 Md. App. 29, 56 A.3d 303 (2012), provides guidance. *Campusano* posed the question of whether an individual defendant was an employer within the meaning of the FLSA and the MWPCL. The Maryland Court of Special Appeals considered, as a matter of first impression in the context of the MWPCL, whether to apply the "four-factor 'economic reality' test of 'control' developed by federal courts for the FLSA and applied [by the Maryland Court of Appeals] in *Newell v. Runnels*, 407 Md. 578, 649-54, 967 A.2d 729, [771-774] (2009) to the Maryland Wage and Hour Law . . . ." *Campusano*, 208 Md. App. at 36, 56 A.3d at 307. The *Campusano* Court concluded that the MWPCL is "sufficiently similar" to the MWHL "for the economic reality test to apply to the analysis of employer" in MWPCL cases. 208 Md. App. at 38, 56 A.3d at 308.

Notably, the *Campusano* Court said, *id.* at 38 n.5, 56 A.3d at 308 n.5: "We . . . are not bound to define 'employer' according to the common law because the broad definition of 'employ' in LE § 3-101 (as incorporated by Payment and Collection Law § 501(b)), evinces the legislature's intent to expand the common law definition of 'employer' just as it did with the MWHL. *See Newell*, 407 Md. at 649-50, 967 A.2d 729." Upon review of the definition of

employer in the MWPCL, and the remedial purposes of the MWPCL statute, the *Campusano* Court said, 208 Md. App. at 38, 56 A.3d at 308: "[T]he reasoning in *Newell* leads us to conclude that the economic reality test governs the definition of 'employer' in Payment and Collection Law § 501(b)."

However, the *Campusano* Court recognized that there is "more than one incarnation of the 'economic reality' test.[]" 208 Md. App. at 38-39, 56 A.3d at 309. Because there was "insufficient evidence that [the defendant] personally benefitted from appellants' labor" (*id.* at 39, 56 A.3d at 309), the court focused on the four-factor economic reality test for "control" that the Maryland Court of Appeals had applied in *Newell* in the context of the MWHL.

Maryland continues to adhere to the decision in *Campusano*. The case of *Pinsky v. Pikesville Recreation Council, Inc.*, 214 Md. App. 550, 588, 78 A.3d 471, 493 (2013), was decided by the Maryland Court of Special Appeals about a year after *Campusano*. There, the Court reiterated that the economic reality test applies to determine if an alleged employer's control over an employee renders a person or entity an employer under the MWPCL. *Id.*

Several other judges of this Court have applied the economic realities test in the context of claims under the MWPCL, MWHL, and FLSA. *See*, *e.g.*, *Coles v. Von Paris Enterprises, Inc.*, PJM-14-450, 2014 WL 6893861, at *3 (D. Md. Dec. 3. 2014) (recognizing that "Maryland courts give broad interpretation to the term 'employer' in the context of Maryland wage and hour law to 'effectuate the FLSA's broad remedial purposes'" and applying the four-pronged economic realities test to determine whether an individual constitutes an employer) (citation omitted); *Iraheta v. Lam Yuen, LLC*, DKC-12-1426, 2012 WL 5995689 (D. Md. Nov. 29, 2012); *Caseres v. S & R Mgt. Co., LLC*, AW-12-1358, 2012 WL 5250561 (D. Md. Oct. 24, 2012); *Khalil v. Subway at Arundel Mills Office Park, Inc.*, CCB-09-158, 2012 WL 231793 (D. Md.

Jan. 24, 2011).  Under this test, "[n]o single factor is dispositive; rather, the totality of the circumstances must be considered."  *Iraheta*, 2012 WL 5995689, at *3; *see Speert v. Proficio Mortg. Ventures, LLC*, JKB-10-713, 2011 WL 2417133, at *3 (D. Md. Jun. 11, 2011).

Therefore, I shall also deny Plaintiffs' Motion on this question as to the MWPCL.

## C.  The Tip Credit

Of the 30 plaintiffs, 25 were employed at some point as tipped workers, and as such were paid a sub-minimum hourly wage.  *See* ECF 140-1 at 18, 18 n.72.  "The FLSA requires covered employers to pay "nonexempt employees" a minimum wage for each hour worked, 29 U.S.C. § 206(a), but allows employers to pay less than the minimum wage to employees who receive tips, 29 U.S.C. § 203(m)."  *Dorsey v. TGT Consulting, LLC*, 888 F. Supp. 2d 670, 680 (D. Md. 2012).  "Those employees are required to receive at least the minimum wage, but their employers are permitted to pay a direct wage of $2.13 per hour and then take a 'tip credit' to meet the $7.25 per hour minimum wage requirement."  *Gionfriddo*, 769 F. Supp. 2d at 893.  In Maryland, the required direct wage for tipped workers is $3.63.  L.E. § 3-419(c).

In order to take advantage of the tip credit, however, employees must (1) be "informed by the employer of the provisions of this subsection," and (2) "all tips received by such employee [must] have been retained by the employee."  29 U.S.C. § 203(m)(2).  "The employer bears the burden of showing that [it] satisfied the FLSA's notice requirement by, for example, providing employees with a copy of § 203(m) and informing them that their tips will be used as a credit against the minimum wage as permitted by law."  *Prusin*, 2017 WL 5126156, at *4 (citation and internal quotation marks omitted).

Both parties have moved for summary judgment on the issue of defendants' entitlement to a tip credit against their minimum wage obligations.  Plaintiffs argue, ECF 140-1 at 35:

"Because no tipped Plaintiff received all tips due or the proper notice, Defendants are not entitled to offset their obligation to pay minimum wage by taking a tip credit." In support of this contention, they assert: (1) "Most tipped Plaintiffs received no timely notice of the tip credit" (*id.* at 38); (2) defendants deducted a credit card processing fee from plaintiffs' tips that was higher than the charge defendants actually incurred for credit card processing (*id.* at 39-40); and (3) defendants had a "policy of requiring servers and bartenders to compensate the business for bills that customers failed to pay." *Id.* at 40.

Defendants also move for summary judgment on this issue, although it is somewhat unclear exactly what ruling they request. They argue (a) that the 3% credit card fee deduction taken from plaintiffs' tips is lawful (ECF 142 at 27-30), and (b) that the 17% charge added to each customer's bill was a service charge, not a tip, and that therefore defendants were not required to present plaintiffs with tip credit notices in the first place. *Id.* at 30-33.

## 1. Failure to Provide Tip Credit Notice

Plaintiffs assert that ten of them never received notice of their tip credit rights, and that six more received notice only belatedly. ECF 140-1 at 38. As a result, plaintiffs insist that, at least with respect to these sixteen plaintiffs, defendants violated the notice requirement of 29 U.S.C. § 203(m)(2), and as a result must be liable for their failure to pay these plaintiffs at the regular minimum wage.

In response, defendants argue that the 17% charge added to each customer's bill is a service fee, and is not properly considered a tip. ECF 142 at 30-33. Therefore, they claim that plaintiffs need not have received a tip credit notice. *Id.* Instead, the amount of the service charge may be applied in its entirety to satisfy minimum wage requirements, although defendants acknowledge that the service charges must be included in the restaurant's gross receipts. *Id.* at

31 (citing *McFeeley*, 825 F.3d at 246); *see also* 29 C.F.R. § 531.55(b) (stating that service charges and other similar sums which become part of the employer's gross receipts are not tips for purposes of the FLSA). Further, defendants contend that "there is undisputed testimony that Defendants treated the mandatory service charges as gross receipts, and reported such payments to employees and took required withholdings from their paychecks." ECF 142 at 33; *see also id.* at 19. However, defendants offer no records of their gross receipts.

Defendants' argument is not supported by the evidence. Even assuming that the 17% charge could qualify as a service charge, defendants cite only three deposition excerpts (ECF 142 at 19 n.57) to support their assertion. As plaintiffs put it, these excerpts "do not remotely suggest, much less prove, that Mo's recorded all mandatory gratuities as gross receipts." Only one of the three cited excerpts even discusses gross receipts. There, the witness (Mark A. Edwards, a manager of one Mo's location) was asked if the 17% service charge is included in the restaurant's gross receipts. He responded, ECF 142-30 at 20: "I don't understand. Seventeen percent is included on your check, yeah." Plaintiffs' counsel clarified, *id.*, "And is that included in sort of the total amount of gross receipts?" Edwards responded, "Under your tip portion, yeah." *Id.* It seems evident from this exchange that Edwards did not understand the concept of gross receipts.

Notably, defendants cite an excerpt from the deposition of Farhad Jafari, another manager, which appears to expressly contradict defendants' argument that the 17% charge is included in the restaurant's gross receipts. ECF 142-34 at 13. When asked what would happen if a customer left a 20% tip instead of the required 17%, Jafari responded, *id.*, "It's the same thing." He also affirmed, "They show [on] the paper how much tip they made." *Id.* This strongly suggests that tips left in addition to the service charge were treated the same as the 17%

service charge.  Notably, Jafari did not mention any special recordkeeping procedure for the service charge amount.

Finally, defendants cite Manocheh's deposition.  ECF 142-36 at 15.  Manocheh did not mention gross receipts or discuss how the service charge was recorded.

Because there is no evidence whatsoever that Mo's recorded the 17% charge in the restaurants' gross receipts, it must be considered a tip.  *See Prusin*, 2017 WL 5126156, at *8 ("Every indication from the evidence on record is that mandatory gratuities were considered synonymous with voluntary tips.").  Therefore, defendants were required to provide plaintiffs notice of their tip credit rights prior to taking the tip credit against their wages.  *See McFeeley*, 825 F.3d at 246 (finding that the service charge offset is unavailable to defendants who did not record mandatory gratuities as part of gross receipts).

It is clear that defendants bear the burden of demonstrating compliance with the FLSA's tip credit provision.  *See Prusin*, 2017 WL 5126156, at *9, 9 n.10.  And, plaintiffs have presented unrebutted evidence that ten plaintiffs were never informed of their tip credit rights (*see* ECF 140-1 at 18 n.74), that five more plaintiffs received only belated notice (*see id.* at 18 n.75), and that one plaintiff received notice at an unspecified point during his employment.  *See id.* at 18 n.76; ECF 140-29 at 8.

Defendants assert that the missing tip credit notice sheets were "apparently lost" (ECF 142 at 16), but offer no evidence that they were ever signed, other than broad statements from the managers' depositions that "everybody got the paper."  *See, e.g.*, ECF 142-35 (Deposition of Iraj Eric Nassiri) at 22.  There is no genuine dispute over the fact that at least 16 plaintiffs belatedly received notice or did not adequately receive notice at all.  Therefore, as to these 16

plaintiffs, defendants cannot claim the tip credit for any hours worked prior to when defendants can prove the plaintiffs were given notice.

## 2. The 3% Credit Card Deduction

Beyond the 16 plaintiffs who did not receive adequate notice of their tip credit rights, plaintiffs maintain that defendants should be precluded from claiming the tip credit because defendants improperly retained a portion of plaintiffs' tips. ECF 140-1 at 39-42.

Specifically, it is undisputed that, for at least four restaurant locations, defendants "routinely deducted a standard credit card processing fee of three . . . percent . . . from the mandatory service charges paid to each server or bartender at the end of their shift." ECF 142 at 17; *see also* ECF 140-1 at 21-22, 39-40. However, it appears that the actual credit card processing fees charged to Mo's "ranged between 0% and 3.2% of the total bill, depending on what credit card was used by the customer. Thus, at various times, Mo's was charged more than 3% and less than 3% credit card processing fees." ECF 142 at 29; *see* ECF 142-39 (monthly credit card deposits and fees).

Plaintiffs move for summary judgment, requesting a finding that this deduction was illegal. *See* ECF 140-1 at 39-40. Defendants also move for summary judgment, requesting a finding that the 3% deduction was reasonable. ECF 142 at 27-30.

To my knowledge, the Fourth Circuit has not addressed the question of whether, as to the tips of an employee, an employer may deduct the cost of converting revenue received via credit cards into cash. However, the Sixth Circuit considered the issue in *Myers v. Copper Cellar Corp.*, 192 F.3d 546 (6th Cir. 1999), and the Fifth Circuit did so in *Steele v. Leasing Enters., Ltd.*, 826 F.3d 237 (5th Cir. 2016). Both of those courts have indicated that "an employer may deduct a fixed composite amount from credit card tips, so long as that composite does not exceed

the total expenditures on credit card issuer fees, and still maintain a tip credit." *Steele*, 826 F.3d at 244.

The Sixth Circuit explained in *Myers*, 192 F.3d at 554:

> [T]he employer may, consistent with the letter and spirit of the FLSA, withhold a standard composite percentage from each credit card tip, even if, as a consequence, some deductions will exceed the expense actually incurred in collecting the subject gratuity, as long as the employer proves by a preponderance of evidence that, in the aggregate, the amounts collected from its employees, over a definable time period, have reasonably reimbursed it for no more than its total expenditures associated with credit card tip collections.

"Stated differently," the court wrote, "the employer must prove that its total deductions from employees' tip incomes did not enrich it, but instead, *at most*, merely restored it to the approximate financial posture it would have occupied" had it not collected tips via credit card. *Id.* at 554-55 (emphasis added).

In the period between *Myers* and *Steele*, the U.S. Department of Labor issued an opinion letter concurring with the *Myers* Court. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter on Tips Charged on a Credit Card and Section 3(m) (Jan. 13, 2006).

Accordingly, it seems clear that Mo's is entitled to deduct a percentage from plaintiffs' tips that is commensurate with the credit card fees it paid over some period of time. Mo's argues that its standard 3% deduction fits this rule, because it was within the range of credit card fees incurred. ECF 142 at 29-30. As such, defendants submit that plaintiffs sometimes benefitted from the standard fee and sometimes did not. *Id.*

Plaintiffs disagree, on the basis that defendants' actual credit card fees during the three months for which defendants provided records (April 2015, May 2015, and February 2016) was about 1.55%. ECF 146 at 25-26; ECF 142-39. They observe that 3% is higher than 1.55% (by almost a factor of two), and claim that "Defendants had a sense of the average credit card

processing fees." ECF 146 at 27. They assert that, "even assuming Defendants had no idea what credit card fees they were being charged, this still does not explain why they would be entitled to pocket their employees' tips in light of this uncertainty." *Id.* As a result, plaintiffs maintain that the 3% deduction is unreasonable. *Id.*

On the facts available, I cannot conclude that the deduction is improper as a matter of law. Although it seems that a standard deduction of 3% to reimburse defendants for an average fee of 1.55% is excessive, it is not clear that the aggregate fees defendants paid for credit card processing were always as low (or as high) as they were in the months of April and May 2015 and February 2016.

Neither party has suggested an appropriate "definable time period" in which the total fees incurred by an employer should match the deductions taken from employees' tips, and other federal courts do not appear to have addressed the question. It seems to me unrealistic to expect an employer to recalibrate its deductions every month, or even every three months. However, as the Sixth Circuit observed, "more advantageous credit servicing terms" and other economic factors may cause changes in rates over time. *See Myers*, 192 F.3d at 553. Thus, if defendants can prove, by a preponderance of the evidence, that their actual credit card fees approximated the 3% deduction taken from plaintiffs' tips over the course of a given year, then that deduction would not be considered unreasonable, and defendants could avail themselves of the FLSA's tip credit.

Accordingly, summary judgment is inappropriate on this issue.

### 3. Policy of Paying for Walkouts

Plaintiffs contend that defendants are not entitled to the benefits of the tip credit because they maintained a formal policy of requiring servers and bartenders to compensate Mo's for bills

that customers failed to pay.  ECF 140-1 at 40-41.  They point to a page in the Mo's employee handbook (ECF 140-33), which states, *id.* at 16: "Any unsigned checks may be deducted from your next paycheck!" and, *id.* at 18: "Non-payment or missing signatures will result in wage garnishment . . . ."  Plaintiffs also present evidence that this policy was enforced, and that on multiple occasions plaintiffs were required to reimburse Mo's from their tips for delinquent customers.  *See* ECF 140-1 at 19-21, *id.* at 19-21 n.82-91.

However, defendants deny that this occurred.  ECF 142 at 14-15.  They present evidence that, since 2005, the employee handbook has not been updated (ECF 142-29, Deposition of Diane Schall, at 9), and imply (without explicitly stating so) that the policy in question is no longer in effect.  And, each of the managers who gave a deposition stated that servers and bartenders were not required to pay for customer walkouts.  *See* ECF 142 at 14-15, 15 n.39.

Plaintiffs urge the Court to disregard this testimony, asserting that it is "self-serving." But, at the summary judgment stage, the Court may not make such credibility determinations. *See Jacobs*, 780 F.3d at 569.

Therefore, I shall deny Plaintiffs' Motion on the question of defendants' policy as to customer walkouts.

### D.  Overtime Claims Prior to July 1, 2014

Defendants observe, ECF 142 at 34: "Until June 30, 2014, the [MWHL] contained an express exemption that provided that restaurants were not required to pay overtime to their employees."  Defendants therefore request summary judgment "with regards to all MWHL claims relating to allegations of unpaid overtime wages prior to July 1, 2014 under the MWHL." *Id.*  According to defendants, plaintiffs should be able to pursue overtime claims prior to July 1,

2014, only "if the Court ultimately finds that Defendants' actions were willful and thus extends the FLSA's statute of limitations from two years to three years." *Id.*

Plaintiffs "concede that, prior to July 1, 2014, the MWHL did not afford them overtime protections." ECF 146 at 32 n.49. Therefore, I shall grant Defendants' Motion on this question, without prejudice to plaintiffs' right to argue that defendants' violations of the FLSA were willful.

## IV. Conclusion

For the reasons stated above, I shall DENY the Motion to Decertify. However, the trial shall proceed on the basis of the three subclasses, as outlined earlier. I shall DENY Plaintiffs' Motion as to Manocheh's liability, defendants' 3% credit card deduction from plaintiffs' tips, and defendants' policy of requiring plaintiffs to cover customers' checks. And, I shall GRANT Plaintiffs' Motion as to defendants' failure to provide a tip credit notice to 16 plaintiffs. As for Defendants' Motion, I shall GRANT it only as to the issue of overtime pay under the MWHL prior to July 1, 2014, and I shall DENY it as to all other issues.

An Order follows.

Date:  May 1, 2018                                        _____/s/_____
                                                                  Ellen Lipton Hollander
                                                                  United States District Judge